# EXHIBIT B

Aircraft Sublease Agreement

FINAL VERSION

# AIRCRAFT SUBLEASE AGREEMENT

dated as of January 31, 2020

between

## HONDA AIRCRAFT COMPANY, LLC,
as Sublessor

and

## WING SPIRIT INC.,
as Sublessee

---

Five (5) Honda Aircraft Company, LLC Classic model HA-420 Aircraft and Ten (10) Honda Aircraft Company, LLC Elite model HA-420 Aircraft

Each equipped with
Two (2) GE Honda Aero Engines model HF120-H1A

---

Counterpart No. 1 of 4 serially numbered manually executed counterparts. No security interest in this document may be created through the transfer and possession of any counterpart other than Counterpart No. 1

735890297

Table of Contents

Page

SECTION 1.    Sublease of Aircraft ...........................................................................1
SECTION 2.    Conditions Precedent; Closing Covenants..........................................1
SECTION 3.    No Partnership, etc..............................................................................4
SECTION 4.    Base Term..............................................................................................5
SECTION 5.    Required Payments.............................................................................5
SECTION 6.    Warranties, Etc ....................................................................................6
SECTION 7.    Subject and Subordinate .....................................................................6
SECTION 8.    Representations and Warranties of the Sublessee ................................7
SECTION 9.    Covenants ..............................................................................................9
SECTION 10.   Negative Covenants ............................................................................11
SECTION 11.   The Sublessee's Payment Obligations.................................................12
SECTION 12.   Security Deposits .................................................................................12
SECTION 13.   Identification Plates .............................................................................13
SECTION 14.   Modification/Improvements .................................................................13
SECTION 15.   Registration, Maintenance and Operation ...........................................14
SECTION 16.   Compliance and Use ............................................................................15
SECTION 17.   Aircraft Marking...................................................................................16
SECTION 18.   Inspection..............................................................................................16
SECTION 19.   Loss or Destruction...............................................................................17
SECTION 20.   Insurance ...............................................................................................18
SECTION 21.   Indemnification......................................................................................20
SECTION 22.   Leasing...................................................................................................26
SECTION 23.   Sublessee Acknowledgement and Agreement.......................................27
SECTION 24.   Events of Default ..................................................................................27
SECTION 25.   Remedies ...............................................................................................28
SECTION 26.   Notices ..................................................................................................30
SECTION 27.   Successors and Assigns ........................................................................31
SECTION 28.   Performance of Obligations of the Sublessee by the Sublessor ...........31
SECTION 29.   Further Assurances ...............................................................................32
SECTION 30.   Purchase Option; Return and Return Conditions..................................32
SECTION 31.   Miscellaneous .......................................................................................33
SECTION 32.   Certain Special Provisions....................................................................36

i

735890297

Table of Contents
(continued)

Page

SCHEDULE I        Insurance Requirements

EXHIBIT A         Definitions

EXHIBIT B         Agreement Supplement

EXHIBIT C         Residual Value Amounts

735890297

## AIRCRAFT SUBLEASE AGREEMENT

**THIS AIRCRAFT SUBLEASE AGREEMENT**, dated as of January 31, 2020 (as amended and supplemented from time to time, this "Agreement"), is between **HONDA AIRCRAFT COMPANY, LLC**, a Delaware limited liability company (the "Sublessor"), and **WING SPIRIT INC.**, a Hawaii corporation (the "Sublessee"). Certain capitalized terms used in this Agreement are defined in Exhibit A hereto, and such definitions are hereby incorporated herein and made a part hereof as though set forth herein in full.

### W I T N E S S E T H:

**WHEREAS**, on the date hereof the Sublessor has entered into the Lease pursuant to which it will lease the Aircraft from the Lessor on the Delivery Date;

**WHEREAS**, on the Delivery Date, the Sublessee desires to sublease from the Sublessor, and the Sublessor desires to sublease to the Sublessee, the Aircraft upon the terms and subject to the conditions of this Agreement; and

**WHEREAS**, it is a condition to the willingness of the Sublessor to sublease the Aircraft to the Sublessee pursuant to this Agreement that the Sublease Guarantor guarantee the Sublessee's obligations under this Agreement and the other Operative Documents;

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and other good and valuable consideration, the Sublessor and the Sublessee agree as follows:

**SECTION 1.** Sublease of Aircraft. Subject to the terms and conditions of this Agreement, the Sublessor hereby agrees to Sublease the Aircraft to the Sublessee, and the Sublessee hereby agrees to lease the Aircraft from the Sublessor, in each case, pursuant to this Agreement and the other Operative Documents.

**SECTION 2.** Conditions Precedent; Closing Covenants.

(a)  Conditions to the Sublessor's Obligations to Closing.  The obligations of the Sublessor to enter into this Agreement and to perform its obligations hereunder and thereunder, are subject to satisfaction of the following conditions:

(i)  the Sublessor shall have received a copy of this Agreement and the Sublease Guaranty, each duly executed by the Sublessee or the Sublease Guarantor, as the case may be, and all in form and substance reasonably satisfactory to the Sublessor;

(ii)  [Reserved].

(iii)  the Sublessor shall have received a copy of the Sublessee's articles of incorporation and certificate of good standing, certified by the Secretary of State of the State of Hawaii as of a date no earlier than five (5) Business Days prior to the Closing Date and an officer's certificate dated the Closing Date stating that such articles of incorporation are in full force and effect and have not been amended;

(iv)    all governmental and regulatory approvals necessary in connection with the transactions contemplated by the Operative Documents shall have been obtained and be in full force and effect.

(v)    no Default or Event of Default shall have occurred and be continuing, and the Sublessor shall have received a certificate from the Sublessee, in form and substance satisfactory to it, to such effect;

(vi)    there shall not have occurred any change in law or regulation that could have a material adverse impact (in the Sublessor's reasonable judgment) on the transactions contemplated by the Operative Documents; and all documents and all legal matters and all proceedings to be taken in connection with the transactions contemplated by the Operative Documents shall be reasonably satisfactory in all respects to the Sublessor;

(vii)    there shall have been paid to the Sublessor and the other parties entitled thereto all Transaction Expenses due and payable to the Sublessor hereunder;

(viii)    a UCC financing statement in form and substance satisfactory to the Sublessor shall have been filed against the Collateral in the appropriate filing office, as determined by the Sublessor;

(ix)    all applicable conditions precedent under the Lease shall have been met or waived in accordance therewith; and

(x)    the Sublessor shall have received such other documents and certificates as the Sublessor may reasonably request in writing.

(b)    <u>Conditions to the Sublessee's Obligations to Closing and on each Delivery Date</u>. The obligations of the Sublessee to enter into this Agreement and perform its obligations hereunder are subject to the satisfaction of the following conditions:

(i)    the Sublessee shall have received a copy of this Agreement, duly executed by the Sublessor;

(ii)    the Sublessee shall have received copies of the FAA Aircraft Registration Application with respect to the Aircraft being delivered on such Delivery Date and (in the case of the first Delivery Date) of an affidavit of citizenship from the Lessor duly completed and executed in proper form for registration with the FAA; and

(iii)    all governmental and regulatory approvals necessary in connection with the transactions contemplated by the Operative Documents shall have been obtained and be in full force and effect.

(c)    <u>Conditions to the Sublessor's Obligations on each Delivery Date</u>.    In addition to the conditions set forth in paragraph (a) above, the obligations of the Sublessor to lease

2

the Aircraft to the Sublessee pursuant to this Agreement on each Delivery Date are subject to satisfaction of the following conditions:

(i)    The Sublessor shall have received an Agreement Supplement and the other Operative Documents not theretofore executed and/or delivered in respect of such Delivery Date, each duly executed and delivered by the Sublessee, appropriately completed and all in form and substance reasonably satisfactory to the Sublessor;

(ii)    there shall have been paid to the Sublessor all Transaction Expenses due and payable to the Sublessor hereunder other than those paid on the Closing Date and on any previous Delivery Date;

(iii)    all sales and use taxes, if any, that are due in respect of the Lessor's purchase of the Aircraft being delivered on such Delivery Date shall have been paid by the Sublessee;

(iv)    the Sublessor shall have received copies of insurance policies covering the Aircraft with all necessary binders and certificates from the various insurance underwriters as required hereunder, which insurance shall comply with the requirements of this Agreement;

(v)    the Sublessor shall have received the security deposit required to be paid pursuant to Section 12 on such Delivery Date;

(vi)    the Aircraft being subleased on such Delivery Date shall be free and clear of all Liens other than the precautionary Lien in favor of the Sublessor created hereunder and any other Permitted Liens;

(vii)    there shall have been filed with the FAA, in proper form for acceptance or recordation, as applicable (in the case of the first Delivery Date) this Agreement and (in the case of the current Delivery Date) the Agreement Supplement with respect to the Aircraft being delivered on such Delivery Date, each of the foregoing having been duly executed and delivered;

(viii)    the Sublessor shall have received evidence that (A) nameplates have been affixed to the Aircraft and each Engine being delivered on such Delivery Date in accordance with this Agreement and (B) a copy of this Agreement, including the Agreement Supplement and all Exhibits and Schedules thereto, have been properly placed within the Aircraft being delivered on such Delivery Date;

(ix)    as required by Section 91.23(c)(3) of the FARs, the Sublessee shall have notified the Flight Standard District Office of the FAA having primary jurisdiction over the home base of the Aircraft of the necessary information contained in the aforesaid regulation;

3

715890297

(x)    copies of (A) the executed FAA Bill of Sale and (B) FAA Aircraft Registration Application (with affidavit of citizenship by the Sublessee) shall have been properly placed within the Aircraft being delivered on such Delivery Date;

(xi)    all applicable conditions precedent under the Lease shall have been met or waived in accordance therewith;

(xii)    the Sublessor shall have received copies, certified as true and correct on behalf of the Sublessee, of all licenses, certificates and permits (if any) required for the operation of the Aircraft being delivered on such Delivery Date;

(xiii)    (in the case of the first Delivery Date) confirmation that the Sublessee has appointed an Administrative User for the purposes of the Cape Town Agreements, and receipt by the Sublessor of confirmation thereof and the name and contact details of such Administrative User, and has granted Professional User consents to FAA Counsel, on the International Registry for purposes of completing registrations as contemplated hereunder;

(xiv)    the Sublessor shall have received opinions of FAA Counsel and (in the case of the first Delivery Date) of Sublessee, each in form, scope and substance satisfactory to it;

(xv)    no Event of Loss with respect to any Aircraft or Engine shall have occurred and be continuing;

(xvi)    no Default or Event of Default shall have occurred and be continuing, no party shall be in default of its obligations hereunder, and all representations and warranties of the Sublessee contained herein shall be true and correct in all material respects on and as of such Delivery Date as if made on such date, except for representations and warranties made on an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, and the Sublessor shall have received a certificate from the Sublessee, in form and substance reasonably satisfactory to it, to such effect; and

(xvii)    the Sublessor shall have received such other documents and certificates as the Sublessor may reasonably request in writing.

The execution and delivery of any Agreement Supplement by the Sublessee, without further act, shall constitute the irrevocable acceptance by the Sublessee of the Aircraft referred to therein for all purposes of this Agreement and the other Operative Documents on and subject to the terms set forth herein and therein and Sublessee's agreement to lease the Aircraft during the Basic Term subject to the terms of this Agreement and the other Operative Documents.

SECTION 3. No Partnership, etc. Nothing set forth herein shall constitute, or be construed as creating, an employment relationship, a partnership, a joint venture or any other kind of relationship or association between the parties or between the Sublessor and the Sublessee or the Sublessee or the Sublessor and any other Person. Except as expressly provided herein or in

4

any other Operative Document between the parties, the Sublessee shall have no authority, express or implied, to bind, or to incur liabilities or enter into contractual obligations on behalf of or in the name of, the Sublessor.

SECTION 4.  Base Term.

The Base Term for the Aircraft shall begin on the Delivery Date (the "Base Term Commencement Date") and end on the Base Term Expiry Date unless this Agreement is otherwise terminated in accordance with the terms hereof.

SECTION 5.  Required Payments.

(a)     Basic Payments.  The Sublessee will pay to the Sublessor a payment with respect to each Aircraft, on the First Basic Payment Date if applicable and on each applicable Basic Payment Date thereafter, to and including the Base Term Expiry Date, in an amount equal to the Basic Payment for such Aircraft.

(b)     Supplemental Payments.  In addition to the Basic Payments, the Sublessee will pay to the Sublessor the following amounts (collectively, the "Supplemental Payments;" the Basic Payments, together with the Supplemental Payments being collectively referred to as the "Required Payments"):

    (i)     as and when expressed to be due hereunder, all amounts (including without limitation, all fees, expenses and indemnities) payable to the Sublessor or any Indemnitee hereunder (other than Basic Payments and amounts specified in clause (i) above and clauses (ii) and (iii) below) that the Sublessee assumes the obligation to pay, or agrees to pay, under this Agreement to the Sublessor;

    (ii)     as and when expressed to be due hereunder all amounts in respect of Termination Value; and

    (iii)     within five (5) Business Days following receipt of written demand therefor, to the extent permitted by Applicable Law, interest (computed on the basis of a 360-day year of actual days elapsed) at the applicable Late Payment Rate on any payment of (x) Basic Payments and (y) Termination Value or any other Supplemental Payment payable to the Sublessor, in each case, to the extent such amounts are not paid when due from and including the due date thereof (without regard to any applicable grace period) to but excluding the date of payment.

The expiration or any other termination of the Sublessee's obligation to pay Basic Payments hereunder will not limit or modify the Sublessee's obligation with respect to Supplemental Payments, to the extent such amounts are or become due and payable.

(c)     Method of Payment.  All payments of Required Payments payable to the Sublessor and any other payments required to be made by the Sublessee to the Sublessor hereunder will be made to the Sublessor by the wire transfer of immediately available funds in Dollars on or before the due date for payment hereof at such account at a bank in the United States of America as the Sublessor designated on the Agreement Supplement or as the Sublessor may designate in a

5

written notice to the Sublessee received by the Sublessee at least three (3) Business Days prior to the applicable due date, and Supplemental Payments due to any Indemnitee shall be paid directly to such Indemnitee, by wire transfer of immediately available funds in the same currency required by the underlying obligation giving rise to the indemnification payment.

SECTION 6. Warranties, Etc. (a) Assignment of Warranties. Effective as of each respective Delivery Date, the Sublessor hereby makes available to the Sublessee from and after such Delivery Date all of the warranties of any Manufacturer with respect to the Aircraft made available to the Sublessor and permitted by the Manufacturer to be made available to the Sublessor hereunder. The Sublessee (i) acknowledges and agrees to all terms of the warranties of the Manufacturer and (ii) agrees to undertake and perform all obligations under such warranties. Upon the occurrence and continuation of an Event of Default, the powers granted in this Section 6 shall terminate automatically and without further act of any Person until Sublessee has satisfied in full all its obligations hereunder to Sublessor.

(b)     Power of Attorney. The Sublessee shall be, and hereby is, authorized to assert and enforce, at the Sublessee's sole cost and expense, from time to time, in the name of and for the account of the Sublessor and/or the Sublessee, as their interests may appear, whatever claims and rights the Sublessee and/or the Sublessor may have against the Manufacturer and any vendor(s), manufacturer(s), supplier(s), distributor(s) and/or any third party providing uplift, service, repairs or otherwise for the Aircraft or any Part, including, without limitation, on account of express or implied warranties, guaranties or indemnification obligations of any such manufacturer(s), supplier(s) and/or distributor(s). The foregoing authorization of the Sublessee shall, to the full extent necessary under Applicable Law, be deemed to constitute a power of attorney granted by the Sublessor to the Sublessee and coupled with an interest. The exercise of the authority set forth under this Section 6 shall, however, be subject to the condition that there shall be no Default or Event of Default continuing under this Agreement.

The Sublessor shall promptly cooperate with the reasonable requests of the Sublessee with respect to any such action controlled by the Sublessee, and the Sublessee shall consult with the Sublessor regarding the conduct of such action, including keeping the Sublessor reasonably informed of the progress of such action, allowing the Sublessor to receive and comment on written submissions and considering in good faith the Sublessor's suggestions regarding such action; provided, that the Sublessor, or its designee, shall have the right to employ its own counsel (the reasonable and documented fees and expenses of such counsel shall be at the expense of the Sublessee) and be entitled to participate in any such action. Subject to satisfaction of the foregoing conditions, including payment by any Operating Party of any indemnity payments under this Agreement and any other Operating Document to the Sublessor or any other Indemnitee, the damages or other proceeds of any such action shall be payable to the Sublessee or its designee. Additionally, in the event any such claims, rights and/or warranties can only be pursued by the Sublessor, the Sublessor, at the request and direction of Sublessee and at Sublessee's reasonable expense, shall pursue the same and the Sublessor shall promptly consult with Sublessee with respect to any such action controlled by the Sublessor.

SECTION 7. Subject and Subordinate. This Sublease shall be subject and subordinate to all the terms of the Lease and, so long as the same shall not have been discharged, to the lien of the Security Agreement, including, without limitation, Lessor's rights to repossession pursuant to

Section 25 of the Lease and to avoid this Sublease upon such repossession. The Sublessee shall not take any action not permitted to be taken by the Lessee under the Lease with respect to the Aircraft.

SECTION 8. Representations and Warranties of the Sublessee. The Sublessee represents, warrants and covenants to the Sublessor that:

(a) Existence and Power. The Sublessee (x) is duly organized and validly existing in good standing under the laws of the state of Utah, (y) has full right, power and authority to enter into and perform its obligations as the Sublessee pursuant to this Agreement and the other Operative Documents and (z) has the power and authority to carry on its business as now conducted and to own and hold under lease its properties.

(b) Trust and Governmental Authorization; No Contravention. The execution, delivery and performance by Sublessee of this Agreement and the other Operative Documents to which it is a party are within its powers, have been duly authorized by all actions required to authorize the execution and delivery hereof and performance hereunder (other than the registration of the Aircraft in the name of the Sublessee with the FAA and the filing of this Agreement and the Agreement Supplement with the FAA, which will have been completed as of the applicable Delivery Date set forth in the applicable Agreement Supplement and except as contemplated by this Agreement and the other Operative Documents) and such execution, delivery and performance will not conflict with or violate any provisions of its articles of organization, or of any agreement, judgment, injunction, order, decree or other instrument binding upon the Sublessee.

(c) Enforceability. This Agreement and the other Operative Documents to which the Sublessee is a party constitute valid obligations of the Sublessee, binding and enforceable against it in accordance with their respective terms.

(d) Perfection. As of the applicable Delivery Date of the Aircraft, the Lender will have a first and prior perfected security interest in the Aircraft, free and clear of all Liens (senior, pari passu or junior) other than the security interest in the Aircraft and Engines created hereunder and other than Permitted Liens. Sublessee and Sublessor shall cooperate to promptly make any filings, recordings and registrations with any Governmental Authority necessary in order to protect the interests of the Sublessor as lessor under this Agreement, and the interests of the Lessor under the Lease and of the Lender under the Security Agreement, and the registration of such interests on the International Registry, with the right to discharge, as contemplated under the Cape Town Agreements, such interests in favor of the Lender.

(e) Litigation. There are no proceedings pending, or to the actual knowledge of the Sublessee threatened, against the Sublessee in any court or before any Governmental Authority or arbitration board or tribunal that, if adversely determined, would materially and adversely affect the financial condition of the Sublessee or the right, power and authority of the Sublessee to enter into, or its ability to perform its obligations under this Agreement or the other Operative Documents.

7

(f)    <u>Licenses and Permits</u>.  The Sublessee and any Part 135 Operator hold all licenses, certificates and permits from governmental authorities necessary to use and operate the Aircraft in accordance with the provisions of this Agreement and the other Operative Documents.

(g)    <u>No Defaults, Etc</u>.  No Default or Event of Default has occurred and is continuing.

(h)    <u>Title</u>.  On the applicable Delivery Date, the Lessor has received record title to the Aircraft, subject to Permitted Liens.

(i)    <u>Anti-Terrorism Laws</u>.

(i)    The Sublessee is not in violation of any Anti-Terrorism Law and has not, and does not, engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law;

(ii)    Neither the Sublessee nor any of its respective agents acting or benefitting in any capacity in connection with the lease or other transactions hereunder, is any of the following (each a "<u>Blocked Person</u>"): (A) a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (B) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (C) a Person or entity with which any bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (D) a Person or entity that commits, threatens, or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, (E) a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or (F) a Person or entity who is affiliated or associated with a Person or entity listed above; and

(iii)    To the actual knowledge of the Sublessee, neither the Sublessee nor any of its respective agents acting in any capacity in connection with the lease or other transactions hereunder (A) conducts any business or engages in making or receiving any contribution of funds, goods, or services to or for the benefit of any Blocked Person or (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

(j)    <u>Material Adverse Effect</u>.  Other than where such non-compliance, individually or in the aggregate, could not reasonably be expected to result in a material adverse effect, the Sublessee is in compliance with (A) all laws, rules, regulations, and orders of any Governmental Authority applicable to it or its property and (B) all indentures, agreements, and other instruments binding upon it or its property.

8

THE SUBLESSEE EXPRESSLY AGREES, AS BETWEEN IT AND THE LESSOR, TO ACCEPT THE AIRCRAFT ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS. THE LESSOR HAS NOT MADE, AND WILL NOT BE DEEMED TO HAVE MADE, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION TITLE TO, OR THE SUBLESSOR'S OR THE SUBLESSEE'S INTEREST IN, THE AIRCRAFT, THE DESIGN OR CONDITION OF THE AIRCRAFT, THEIR MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE AIRCRAFT, THE VALUE OR AIRWORTHINESS OR THE CONFORMITY OF THE AIRCRAFT TO THE PROVISIONS AND SPECIFICATIONS THEREFOR, ANY PATENT INFRINGEMENT BY, OR LATENT DEFECTS IN, THE AIRCRAFT, NOR WILL THE LESSOR BE LIABLE, REGARDLESS OF ANY CAUSE, INCLUDING, WITHOUT LIMITATION, ACTUAL OR ALLEGED NEGLIGENCE OF THE LESSOR FOR LOSS OF ANTICIPATORY PROFITS OR FOR STRICT OR ABSOLUTE LIABILITY IN TORT.

THE SUBLESSEE ACKNOWLEDGES THAT THE LESSOR IS NOT A MANUFACTURER OR VENDOR OF THE AIRCRAFT OR EITHER ENGINE OR ANY PART. THE SUBLESSEE CONFIRMS THAT IT HAS SELECTED THE AIRCRAFT, THE ENGINES AND EACH PART THEREOF, AND THE MANUFACTURER, EACH SELLER AND VENDOR OF THE AIRCRAFT, ON THE BASIS OF ITS OWN JUDGMENT.

SECTION 9. Covenants. Affirmative Covenants. The Sublessee covenants and agrees with the Sublessor that so long as this Agreement shall remain in effect or any Required Payments remain payable to the Sublessor, or any fees or any other amounts payable to the Sublessor hereunder shall be unpaid, unless the Sublessor shall otherwise consent in writing, the Sublessee will:

(a)     Existence. Do or cause to be done all things necessary to preserve and keep in full force and effect its legal existence, rights and franchises, material to the conduct of its business.

(b)     Compliance With Law. Comply in all material respects with all Applicable Law, ordinances, rules, regulations and requirements of any Governmental Authority, except where the necessity of compliance therewith is contested in good faith by appropriate proceedings.

(c)     Use of Aircraft. Require operation of the Aircraft in compliance with all laws, rules and regulations of every Governmental Authority having jurisdiction over the Aircraft and in a manner that will allow the Aircraft to qualify for Manufacturer maintenance.

(d)     Insurance. Ensure that the Aircraft will, in all events be, flown, hangared and operated:

(i)     consistently with all insurance required under Section 20 and Schedule 1 hereof such that the Aircraft shall remain subject to registration with the FAA; and

9

(ii)    in compliance with all laws, rules and regulations of every Governmental Authority having jurisdiction over the Aircraft.

(e)    Costs. Pay or cause to be paid all costs, expenses, fees and charges incurred in connection with the use and operation of the Aircraft.

(f)    Litigation and Other Notices. Give the Sublessor prompt written notice, but in no event later than three (3) Business Days of obtaining actual knowledge, of the following:

(i)    the institution of any litigation or proceeding involving the Sublessee that could reasonably be expected to materially and adversely affect the operations, financial condition, property or business prospects of the Sublessee; and

(ii)    the occurrence of any Default or Event of Default, specifying the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto.

(g)    Notice of Change of Jurisdiction of Formation; Address; Change of Name. Provide the Sublessor prompt written notice, but in no event later than three (3) Business Days of obtaining actual knowledge, following any anticipated change in its address or jurisdiction of formation and shall promptly notify the FAA of any change of its name.

(h)    FAA Registration. Cause the Aircraft to remain duly registered with the FAA in the name of the Lessor and comply with the re-registration and renewal requirements of 14 CFR §47 (as amended by the Final Rule, Re-Registration and Renewal of Aircraft Registration, Federal Register / Vol. 75, No. 138 / Tuesday, July 20, 2010). The Sublessee will cause the registration of the Aircraft to be renewed at least three (3) months prior to expiration and provide the Sublessor evidence of the same. The Sublessor shall cooperate with the Sublessee in the implementation of this paragraph.

(i)    Airworthiness. Maintain, in good standing, a current and valid Certificate of Airworthiness (in the appropriate category for the nature of the operations of the Aircraft) for the Aircraft, issued by the Governmental Authority, except during any period when the Aircraft is undergoing maintenance, modification or repair required or permitted by this Agreement, and will from time to time provide to the Sublessor a copy thereof on request.

(j)    Maintenance.    Except as otherwise provided for in the Operative Documents, at its expense, take all actions necessary to maintain and repair the Aircraft to keep it in as good operating condition as of the applicable Delivery Date, ordinary wear and tear resulting from proper use excepted, and, unless otherwise expressly provided for in this Agreement, shall enter into and keep in force a maintenance agreement or program with the manufacturer or other maintenance provider reasonably acceptable to the Sublessor to provide such maintenance and repair. Except as otherwise provided for in the Operative Documents, the Sublessee shall, at its expense, promptly replace all parts of any item of the Aircraft that become worn out, lost, stolen, destroyed, or unfit for use with replacement parts free of any encumbrance (and title thereto shall vest in the Sublessor immediately upon installation), subject to the requirements of Section 15.

10

(k)     Ownership and Identification. Subject to Section 30, cause the Aircraft at all times to remain the sole and exclusive property of the Lessor or its agents. The Sublessee shall have no right, title or interest in the Aircraft except as set forth in the Operative Documents. The Sublessee shall give the Sublessor immediate notice of any attempt by any third party to gain control of the Aircraft (including, without limitation, any attachment or levy against the Aircraft) of which the Sublessee has actual knowledge. The Sublessee acknowledges that, the Lessor may grant Permitted Liens in the Aircraft and the Lessor's interest therein in order to secure the Lessor's obligations under the Loan Agreement. Further, Sublessee and Sublessor shall establish, maintain, preserve, perfect and protect the Lessor's title to, and its, the Sublessor's and the Lender's interests in, the Aircraft and the rights of the Lessor, the Sublessor and the Lender in the Aircraft and under the Operative Documents and, in particular (but without limitation), the Sublessee shall forthwith do all such acts as may be necessary to perfect recognition of the Lessor's title to, and the interests of the Lessor, the Sublessor and the Lender in, the Aircraft in accordance with the Cape Town Agreements.

SECTION 10.  Negative Covenants.  The Sublessee covenants and agrees with the Sublessor that so long as this Agreement shall remain in effect or any Required Payments remain payable to the Sublessor, or any fees or any other amounts payable to the Sublessor hereunder shall be unpaid, unless the Sublessor shall otherwise consent in writing, the Sublessee will not:

(a)     sublease, hire out, or otherwise transfer or part with the possession, control or custody of the Aircraft, other than as expressly provided for in the Operative Documents. This Agreement and any other permitted sublease of the Aircraft shall be expressly subject and subordinate to this Agreement, the Lease and the Security Agreement.

(b)     make any assignment of this Agreement or its interest hereunder, subject to Section 27;

(c)     create incur, assume or suffer to exist any liens, other than Permitted Liens, on or with respect to the Aircraft, the Lessor's title thereto or any interest therein (and the Sublessee will promptly, at its own expense, take such action as may be necessary duly to discharge any such lien), except (i) the respective rights of the Lessor and the Sublessor as provided in the Lease, (ii) the respective rights of the Sublessor and the Sublessee as herein provided, (iii) inchoate material men's, mechanic's or other like liens arising in the ordinary course of business of the Sublessee and not delinquent, and (iv) liens granted by the Lessor to any assignee;

(d)     permit the Aircraft to be utilized in any manner not originally intended without the prior written consent of the Sublessor, such consent not to be unreasonably withheld, conditioned or delayed; or

(e)     use any of the financial accommodations made available to it hereunder in violation of any Applicable Law. In connection with the foregoing, the Sublessee will not use any of such financial accommodations: (a) to fund any operations of, to finance any investments or activities in, or to make any payments to, any Person named on the list of specially designated nationals or Blocked Persons maintained by the United States Department of the Treasury's Office of Foreign Assets Control; or (b) to fund any operations in, to finance any investments or activities in, or to make any payments to, an agency of the government of a country, an organization

11

735890297

controlled by a country, or a Person resident in a country that is subject to a sanctions program administered by the United States Department of the Treasury's Office of Foreign Assets Control under 31 C.F.R. Chapter V.

SECTION 11.   The Sublessee's Payment Obligations.  This Agreement is a net lease, and the Sublessee acknowledges and agrees that Sublessee's obligation to pay all Required Payments payable to the Sublessor hereunder (or any indemnification payments payable to the Indemnitees), and the rights of the Sublessor in and to such Required Payments and other sums in each case payable to the Sublessor, will be **ABSOLUTE AND UNCONDITIONAL UNDER ALL CIRCUMSTANCES** and will not be subject to any abatement, reduction, set-off, defense, counterclaim or recoupment of any kind or description ("Abatements") for any reason whatsoever, including without limitation, Abatements due to any present or future claims of the Sublessee against the Sublessor under this Agreement or otherwise against the Manufacturer, any Indemnitee, any supplier of any Part or against any other Person for whatever reason, or by reason of any defect in or damage to, or any loss or destruction of the Aircraft, or the prohibition of or interference with the use thereof, or the bankruptcy or insolvency of the Sublessor or any other Person, it being the express intention of the Sublessor and the Sublessee that all Required Payments payable by the Sublessee thereunder shall be and continue to be promptly and unconditionally payable in all events.  This Agreement will not terminate for any cause, nor will the obligations of Sublessee be affected by, any invalidity of title or any defect in the title, condition, design, merchantability, airworthiness or fitness for use of, or operation of the Aircraft, or as a result of damage to, or any loss, or destruction of, the Aircraft or any Part thereof from whatsoever cause, the ineligibility of the Aircraft for registration or documentation under the laws of any relevant jurisdiction, or the interference with the use thereof by the Sublessor or any other Person, the invalidity or unenforceability of this Agreement or any other Operative Document, the impossibility or illegality of performance by the Sublessee, the Sublessor or any other Person, the insolvency, bankruptcy or reorganization of any Person, the unavailability of the Aircraft for any reason or for any other cause, whether similar or dissimilar to the foregoing, any present or future law or regulation to the contrary, notwithstanding the Sublessee hereby waives, to the extent permitted by Applicable Law, any and all rights which it may now or hereafter have, by statute or otherwise, to terminate, cancel, quit or surrender the lease of, or its agreement to use, the Aircraft, it being the express intention of the Sublessor and the Sublessee that all Required Payments payable by the Sublessee hereunder to the Sublessor and any indemnification payments to the Indemnitees and other sums payable to the Sublessor hereunder will be, and continue to be, payable in all events unless the obligation to pay the same is terminated pursuant to the express provisions of this Agreement.

SECTION 12.   Security Deposits.  The Sublessee shall, on or before each Delivery Date, pay a security deposit to the Sublessor as security for the obligations of the Sublessee under the Operative Documents in an amount equal to two (2) Basic Payments in respect of the Aircraft to be delivered on such Delivery Date.  Such security deposits shall be the Sublessor's absolute property, shall not bear interest and may be commingled by the Sublessor with its own general or other funds.  The Sublessor may, but shall not be obliged to, apply such security deposits in whole or in part for the payment of any amounts owing but unpaid from time to time by the Sublessee under any Operative Documents, or may utilize such security deposits in whole or in part to perform any of the Sublessee's unperformed obligations under any Operative Document or

12

otherwise remedy any Event of Default (including, without limitation, in respect of the redelivery condition of the Aircraft), without prejudice to any other remedy of the Sublessor.

In the event that this Agreement terminates for any reason, conditional upon the prior payment in full by the Sublessee of all sums due by it under the Operative Documents, the Sublessor shall repay the unapplied balance of such security deposits to the Sublessee within fifteen (15) days of the date of such full payment. Notwithstanding the foregoing, the Sublessee expressly acknowledges and agrees that the Sublessor shall be entitled to set off the available balance of such security deposits against any obligations of the Sublessee hereunder in the event of an early termination of this Agreement.

SECTION 13.  Identification Plates.  The Sublessee shall procure that the cockpit of each Aircraft and each Engine shall be equipped at all times during the Base Term with a fireproof plate of a size no less than 10 cm x 7 cm, permanently affixed in a prominent position, setting forth, in the following terms and in clearly legible characters, that "THIS [AIRCRAFT WITH MANUFACTURER'S SERIAL NUMBER] / [ENGINE WITH MANUFACTURER'S SERIAL NUMBER] IS OWNED BY BANK OF UTAH, AS OWNER TRUSTEE, AND IS SUBJECT TO A FIRST PRIORITY SECURITY INTEREST IN FAVOR OF APPLE BANK FOR SAVINGS" or such other text as may subsequently be required by the Sublessor specifying in summary form the ownership of and security interests over the Aircraft pursuant to the Operative Documents.

SECTION 14.  Modification/Improvements.  Except where the failure to do so would not have a material adverse effect on the fair market value, utility, residual value or remaining useful life of the Aircraft and would not materially adversely affect its condition or airworthiness, the Sublessee or its designee, at the Sublessee's own cost and expense, will promptly replace all Parts in accordance with the terms hereof which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever.  In addition, in the ordinary course of maintenance, service, repair, overhaul or testing, the Sublessee, or its designee, may remove any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; provided, that the Sublessee shall cause such Parts to be replaced as promptly as practicable in accordance with the terms hereof.  All replacement parts (such replacement or substituted parts referred to as "Replacement Parts") shall be free and clear of all Liens other than Permitted Liens and shall be in as good operating condition as, and shall have a fair market value, utility, modification status, residual value and remaining useful life at least equal to the Parts replaced, assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof. All hard time component life parts will be replaced with new or newly overhauled Parts with full life interval, when removed and replaced due to life expiration.

Subject to the second succeeding paragraph, all Parts subleased by the Sublessor under this Agreement at any time removed from the Aircraft shall remain the property of the Lessor and subject to this Agreement, no matter where located, until such time as such Parts shall be replaced by Replacement Parts which have been incorporated or installed in or attached to the Aircraft and which meet the requirements for replacement parts specified above.  Immediately upon any Replacement Part becoming incorporated or installed in or attached to the Aircraft as above; provided, that without further act by the Sublessor, (A) title to the replaced Part shall thereupon vest in Sublessee, free and clear of all rights of the Sublessor and the Lessor and shall no longer

13

be deemed a Part; (B) title to such Replacement Part shall thereupon vest in the Lessor; and (C) such Replacement Part shall become subject to this Agreement and be deemed part of such item to the same extent as the Parts originally incorporated or installed in or attached to the Aircraft.

The Sublessee, at its own expense, shall make alterations and modifications in and additions to the Aircraft as may be required from time to time under any Applicable Law or as required by any Governmental Authority. In addition, the Sublessee, at its own expense, may from time to time make such alterations and modifications in and additions to the Aircraft (collectively "Alterations") as the Sublessee may deem necessary in the proper conduct of its business; provided, that no such Alteration diminishes the fair market value, residual value, utility or remaining useful life of the Aircraft below the fair market value, utility, remaining useful life, or residual value of the Aircraft immediately prior to such Alteration in any material respect (as determined by the Sublessor in its reasonable discretion), assuming the Aircraft was then in the condition required to be maintained by the terms of this Agreement, or diminishes the airworthiness of the Aircraft; provided, further that the Sublessee shall not convert the Aircraft to an all-cargo or primarily cargo configuration without the prior written consent of the Sublessor.

Title to all Parts incorporated or installed in or attached or added to the Aircraft as the result of any Alteration made as contemplated in the preceding paragraph shall automatically vest in the Lessor; provided, however, that so long as no Event of Default shall have occurred and be continuing, at any time during the Base Term, the Sublessee, or its designee, may remove any Part, provided, further that (A) such Part is in addition to, and not in replacement of or in substitution for, any Part originally incorporated or installed in or attached to the Aircraft at the time of delivery thereof hereunder or any Part in, replacement of, or substitution for, any such original Part; (B) such Part is not required to be incorporated or installed in or attached or added to the Aircraft pursuant to the terms of this Agreement; and (C) such Part can be removed from the Aircraft without diminishing or impairing the fair market value, residual value, utility, or remaining useful life of the Aircraft in any material respect or the airworthiness of the Aircraft, which the Aircraft would have had at such time had such Alteration not occurred. Upon the removal by the Sublessee, or its designee, of any such Part as summarized above, title thereto shall, without further act, vest in Sublessee and such Part shall no longer be deemed a Part. Any Part not removed by the Sublessee, or its designee shall remain the property of the Lessor.

SECTION 15.  Registration, Maintenance and Operation.

(a)     The Sublessee, at its own expense, will:

(i)     cause the Aircraft to be duly registered, at all times from and after the Delivery Date for the Aircraft, in the name of the Lessor under the Federal Aviation Act and will not permit the Aircraft to be registered under the laws of any country other than the United States of America;

(ii)     maintain, inspect, service, repair, overhaul and test (or cause to be maintained, inspected, serviced, overhauled and tested) the Airframe and each Engine and all other Parts under the MSP and in accordance with (w) all maintenance manuals initially furnished with the applicable Aircraft, including any subsequent amendments or supplements to such manuals issued by the

14

Manufacturer or any other Person from time to time, (x) all recommended service bulletins and aircraft modification kits, issued, supplied or available by or through the applicable Manufacturer with respect to the Aircraft, (y) all "airworthiness alerts" and ADs issued by the FAA or similar regulatory agency or Governmental Authority having jurisdictional authority, and whenever recommended by any Manufacturer causing compliance with such directives to be completed through corrective modification in lieu of operating manual restrictions and (z) to at least the same standard as any other comparable aircraft in the Sublessee's fleet;

(iii)    maintain or cause to be maintained all records, Logs and other materials required by the FAA and any other Governmental Authority to be maintained in respect of the avionics, each Airframe and each Engine or by the applicable manufacturer thereof for enforcement of any warranties; and

(iv)    promptly furnish or cause to be furnished to the Lessor such information as may be required to enable the Lessor to file any reports required by any Governmental Authority as a result of the Lessor's holding record title to the Aircraft.

(b)    All maintenance procedures required by Section 15(a)(ii) will be undertaken and completed in accordance with the relevant Manufacturer's recommended procedures and the Maintenance Program, and only by properly trained, licensed, and FAA certified maintenance personnel, so as to keep the Airframes and Engines in as good operating condition as when delivered pursuant to the Purchase Agreement (ordinary wear and tear excepted), and so as to keep the Aircraft in such operating condition as may be necessary to enable the airworthiness certification of the Aircraft to be maintained in good standing at all times under the Federal Aviation Act. If any Engine is damaged or is being inspected or overhauled, the Sublessee, at its option, may substitute another engine of the same make and model as the Engines being repaired or overhauled; provided, that such engine is approved by the FAA and the Manufacturer for use thereon (a "Loaner Engine") during the period of such repair or overhaul; provided, further, (x) installation of the Loaner Engine is performed by one or more mechanics who is FAA-certified with respect to an aircraft of the type of the Aircraft, (y) the Loaner Engine is removed and the repaired or overhauled Engine is reinstalled on the Airframe promptly upon completion of the repair or overhaul of the Engine but in no event later than the expiration or earlier termination of the Base Term of this Agreement, and (z) the Loaner Engine is maintained in accordance with the requirements of this Section 15.

SECTION 16.  Compliance and Use. The Sublessee agrees that the Aircraft will be maintained, used and operated in compliance with any and all statutes, laws, ordinances, regulations and mandatory standards or directives issued by the FAA and any other Governmental Authority applicable to the maintenance, use or operation thereof, including, without limitation, all FARs, in compliance with any airworthiness certificate, license or registration relating to the Aircraft issued by any Governmental Authority and in a manner that does not impair any existing warranties on the Aircraft or any part thereof. The Sublessee also represents and warrants that it will permit the Aircraft to be operated solely in the conduct of the business of the Sublessee and will not operate or permit the Aircraft to be operated (i) at any time or in any geographic area that would invalidate the insurance required by the provisions of Section 20 hereof or in contravention

15

of any insurance policy in any material respect, or (ii) in a manner wherein the predominance of use during any consecutive twelve (12) month period would be for the purpose other than passenger transportation, or in a manner, for any time period, such that the Sublessor or a third party other than the Sublessee, the Sublessor or a Part 135 Operator will be deemed to have "operational control" of the Aircraft. For the avoidance of doubt, the Sublessee shall be permitted to conduct the carriage of such Operating Party and/or guests pursuant to 14 CFR Section 91.501 (b) (4), affiliated group operations pursuant to 14 CFR Section 91.501 (b) (5) and/or (6), demonstration flights pursuant to 14 CFR Section 91.501 (b) (3), time sharing or interchange operations pursuant to 14 CFR Section 91.501(b) (6), the carriage of customers pursuant to 14 CFR Section 91.501 (b) (9) and/or the carriage of candidates in Federal elections conducted pursuant to 14 CFR Section 91.321. In addition, the foregoing shall be not be deemed to prohibit the delivery of possession of the Aircraft, any Engine or Part to another Person for testing, service, repair, maintenance, overhaul or, to the extent permitted hereby, alteration or modification. No acceptance, assignment, subletting, relinquishment or installation shall in any event relieve Sublessee of primary, absolute and unconditional liability for its duties and obligations under this Agreement. Notwithstanding anything in this Agreement to the contrary, provided that no Event of Default has occurred and is continuing, the Sublessee may charter and/or sublease the Aircraft to any person controlling, controlled by, or under common control with the Sublessee, and for this purpose, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any such Person, whether through the legal or beneficial ownership of voting securities, by contract or otherwise. Throughout the Base Term, the possession, use and maintenance of the Aircraft will be at the sole risk and expense of the Sublessee and the relevant Aircraft will be based at the Primary Hangar Location set forth in the Agreement Supplement. At all times the Aircraft will be operated only by duly qualified, currently certified pilot(s) having at least the minimum total pilot hours required by the requirements of the insurance carriers providing the insurance pursuant to this Agreement and for such certification by the FAA and will not be used in violation of law for the transport of narcotics, illegal substances or other contraband or in contravention of any Applicable Law.

SECTION 17. Aircraft Marking. The Sublessee agrees, at its own cost and expense, to (i) cause the Airframe and Engines to be kept numbered with the identification or serial number therefor as specified in the Agreement Supplement; (ii) prominently and properly display on the Aircraft the FAA registration number, and only the FAA registration number, specified in the Agreement Supplement; (iii) notify the Sublessor in writing promptly after making any material change in the configuration (other than any change in configuration mandated by the FAA or any other Governmental Authority), appearance or coloring of the Aircraft from that in effect at the time the Aircraft is accepted by the Lessor under the Purchase Agreement; (iv) at all times carry a copy of this Agreement, the Agreement Supplement, the Lease and a current and valid FAA Aircraft Registration Application or AC Form 8050-3 Certificate of Registration on the applicable Aircraft; and (v) comply with any related requirements under the Loan Agreement.

SECTION 18. Inspection. The Sublessor, or its designee, will have the right during a mutually agreed upon ordinary time and reasonable prior notice and without disruption to an Operating Party's normal business operations and the use or operation of the Aircraft to enter the premises where the Aircraft is located and inspect the Aircraft and the Sublessee shall cooperate with the Sublessor or its designee in conducting such activities once during each calendar year if no Event of Default has occurred and is continuing and at other reasonable times if an Event of

Default has occurred and is continuing.  Upon the written request of the Sublessor, the Sublessee will confirm to the Sublessor the location of the applicable Aircraft, and after reasonable prior notice to the Sublessee and without disruption to an Operating Party's normal business operations and the use or operation of the Aircraft, the Sublessee will make the Aircraft and Logs and records pertaining to the Aircraft (or cause the same to be made) available to the Sublessor, or any of its authorized representatives for inspection.

SECTION 19.  Loss or Destruction.  (a)  Upon the occurrence of an Event of Loss with respect to any Airframe, the Sublessee will give the Sublessor written notice thereof within ten (10) Business Days following such occurrence.  So long as no Event of Default has occurred and is continuing, the Sublessee may, at its option, either (i) replace the affected Aircraft with an aircraft of like make and similar (or better) model, having at least the same utility, fair market value, residual value and remaining economic useful life as the replaced Aircraft immediately prior to such Event of Loss, or (ii) upon fifteen (15) days' notice to the Sublessor that the Sublessee desires to exercise this option (ii), pay or cause to be paid to the Sublessor, on the next succeeding Basic Payment Date occurring at least ninety (90) days after such Event of Loss, the Termination Value (the "Termination Payment") with respect to such Aircraft.  Upon making such Termination Payment, the Sublessee's obligation to pay further Basic Payments for such Aircraft will cease, and the Sublessor's right title and interest in such Aircraft will be transferred to the Sublessee "as is, where is" and without representation or warranty, except for the absence of Sublessor Liens.  In the case of an Event of Loss, the Sublessee will be entitled to recover possession of the Aircraft, unless possession thereof is required to be delivered to an independent insurance carrier in order to settle an insurance claim arising out of such Event of Loss.  The Sublessor will be under no duty to the Sublessee to (but shall, at the Sublessee's reasonable expense, if requested by the Sublessee) pursue any claim against any Governmental Authority, but the Sublessee may at its own cost and expense pursue the same in such manner as may be satisfactory to the Sublessee, and the Sublessor will cooperate, at the Sublessee's expense, with the Sublessee in connection therewith.  With respect to a Requisition of Use of any Airframe or Engine then installed thereon, the Sublessor agrees that the Sublessee may receive and retain all amounts paid by any Governmental Authority or any third party in connection with such Event of Loss.

(b)    Upon the occurrence of an Event of Loss with respect to any Engine or Part under circumstances in which there has not occurred an Event of Loss with respect to the Airframe upon which such Engine or Part was currently or previously installed, the Sublessee will give the Sublessor written notice thereof within ten (10) Business Days following such occurrence and will, within sixty (60) days after the occurrence of such Event of Loss, duly convey to the Lessor, in replacement of the Engine or Part with respect to which such Event of Loss occurred a similar engine or part of at least equivalent make, model and modification status as that suffering the Event of Loss, fully interchangeable as to form, fit and function, free and clear of all Liens (other than Permitted Liens) and having a useful life and utility at least equal to, and being in as good operating condition as, the Engine or Part with respect to which such Event of Loss occurred, assuming such Engine or Part was of the quality or utility and in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss.  Prior to or at the time of any such conveyance, the Sublessee, at its own expense, will furnish the Sublessor with such documents and filings, including but not limited to any UCC financing statement or any filing with the FAA, to evidence such conveyance as the Sublessor will reasonably request in writing.  Upon full compliance by the Sublessee with the terms of this Section 19(b), the Sublessor will transfer

17

to Sublessee, without recourse or warranty, all of the Sublessor's right in and to the Engine or Part with respect to which such Event of Loss occurred. For all purposes hereof, each such replacement engine will, after such conveyance, be deemed part of the property subject to the Sublessee's right of use hereunder, will be deemed an "Engine" as defined herein and will be deemed part of the same Aircraft as was the Engine replaced thereby and each Replacement Part will, after such conveyance, be deemed part of the property subject to the Sublessee's right of use hereunder, will be deemed a "Part" as defined herein and will be deemed part of the applicable Aircraft as the Part replaced thereby. No Event of Loss with respect to an Engine or any Part under the circumstances contemplated by the terms of this paragraph will result in any reduction in or delay in payment of any Required Payment payable to the Sublessor or relieve the Sublessee of any other obligation (other than with respect to replaced Engine or Parts) under this Agreement. Nothing in this paragraph (b) shall derogate from the Sublessee's rights under Section 30(a).

(c)     The Sublessee will bear all risk of loss, theft, damage or destruction to the Aircraft, each Part thereof and to the Engines, however incurred or occasioned, and the Sublessee will not be released from its obligations (other than with respect to replaced Parts and as otherwise provided in Section 19(a) should the Sublessee elect to make a Termination Payment) hereunder in the event of any damage to the Aircraft or any Part thereof or any Event of Loss relating thereto.

(d)     Provided no Event of Default shall have occurred and be continuing, if the Sublessor receives payment under any insurance policy maintained pursuant to Section 20 hereof in connection with an Event of Loss of an Engine or Part, the Sublessor, from such insurance proceeds, will promptly remit the same to the Sublessee in accordance with the terms of Section 20(g) hereof.

**SECTION 20.**   Insurance.

(a)     The Sublessee's Obligation to Insure.   The Sublessee shall maintain or cause to be maintained insurance in accordance with Schedule I hereto.

(b)     Sublessor may Perform.   If the Sublessee shall default in effecting or maintaining any insurance or if any insurance shall from any cause become void, the Sublessor may (but without any obligation to do so) effect and keep up such insurance at the Sublessee's sole cost and the Sublessee will forthwith upon demand repay to the Sublessor, as the case may be, all premiums and other monies from time to time paid by or on behalf of the Sublessor, as the case may be, in respect of such insurance.

(c)     Insurance for Own Account.   Nothing in this Section 20 or Schedule I shall limit or prohibit (x) the Sublessee from maintaining the policies of insurance required under this Section 20 with higher limits than those specified in Schedule I or (y) the Sublessor at its sole cost and expense from obtaining insurance for its own account (and any proceeds payable under such separate insurance shall be payable as provided in the policy relating thereto and the Operating Parties shall have no obligation for any premiums or charges incurred as a result of such policies); provided, however, that no insurance may be obtained or maintained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by the Sublessee pursuant to this Section 20.

735890297

(d)     Application of Insurance Proceeds.  As between the Sublessee and the Sublessor, all insurance proceeds received as a result of the occurrence of an Event of Loss with respect to the Aircraft or either Engine under policies required to be maintained by the Sublessee pursuant to this Section 20 will be applied as provided in Sections 19(d) and 20(g) hereof. Following compliance with Section 20(g) hereof, any remaining proceeds shall be paid to the Sublessee.  All proceeds of insurance required to be maintained by the Sublessee in accordance with this Section 20 in respect of any property damage or loss not constituting an Event of Loss with respect to the Aircraft or any Airframe or Engine will be applied in payment (or to reimburse the Sublessee) for repairs or for replacement property.

(e)     Application of Payments During Existence of Default.  Any amount described in this Section 20 that is payable or creditable to, or retainable by, the Sublessee shall not be paid or credited to, or retained by, the Sublessee if at the time such payment, credit or retention an Event of Default shall have occurred and be continuing, but shall be held by or paid over to the Sublessor in the manner set forth in Section 5(c) as security for the obligation of the Sublessee under this Agreement and applied against the Sublessee's obligations hereunder and if and when due.  If, at such time, there shall not be any Event of Default, then such amounts shall be paid to the Sublessee to the extent not previously applied in accordance with the preceding sentence.

(f)     Aircraft Not in Operation.  During any period that any Airframe or an Engine while temporarily removed from the Aircraft, pursuant to the terms of this Agreement, and not replaced by similar components, as the case may be, is on the ground and not in operation and such grounding is not the result of an Event of Default that has occurred and is continuing, the Sublessee may, carry or cause to be carried as to such non-operating property, in lieu of the insurance required by this Section 20, insurance otherwise conforming with the provisions of this Section 20; provided, that the amounts of coverage, the scope of the risks and the type of insurance shall be the same as from time to time applicable to Aircraft owned or leased by the Sublessee of the same type as the Aircraft similarly on the ground and not in operation.

(g)     Application of Payments.  Any amounts, other than insurance proceeds in respect of damage or loss not constituting an Event of Loss (the application of which is provided for in Section B of Schedule 1 of this Agreement) received at any time by the Sublessee or any other Person in respect of any Event of Loss will be applied as follows:

(i)     Replacement of Engines.  If such amounts are received with respect to any Engine installed thereon at the time of such Event of Loss, and if Sublessee has elected to replace such Engine, then, upon compliance by the Sublessee with the applicable terms of this Agreement with respect to the Event of Loss for which such amounts are received, such amounts shall be paid over to, or retained by, the Sublessee; provided, that such proceeds may be applied by Sublessee to the acquisition of such replacement Engine in accordance with Sections 14, 15 and 19.

(ii)     Loss of Engine.  If such amounts are received with respect to an Engine (other than an Engine installed on an Airframe at the time the Airframe suffers an Event of Loss), upon compliance by the Sublessee with the applicable terms of this Agreement and the other Operative Documents with respect to the

19

Event of Loss for which such amounts are received, such amounts shall be paid over to, or retained by, the Sublessee; provided, that such proceeds may be applied by Sublessee to the acquisition of a replacement Engine in accordance with Sections 14, 15 and 19.

(iii)    Payment of Loss.  If such amounts are received, in whole or in part, with respect to an Airframe, such amounts shall be applied in accordance with this Section 20 and Schedule I.

SECTION 21.  Indemnification.

(a)    General Indemnity. The Sublessee hereby assumes liability for, and does hereby agree to indemnify, protect, save, defend, and hold each Indemnitee harmless on an After-Tax Basis from and against, any and all obligations, fees, liabilities, losses, damages, penalties, claims, demands, actions, suits, judgments, costs and expenses, including reasonably incurred and documented legal fees and expenses, of every kind and nature whatsoever (herein referred to as a "Liability"), which may be asserted against any Indemnitee, in any way, directly or indirectly relating to, or arising out of (or alleged to directly or indirectly arise out of or relate to) the leasing, maintenance, use or possession of the Aircraft or the Overall Transaction, the Aircraft, or the execution, delivery, performance of, nonperformance or other condition of any kind with respect to, any Operative Document, including, without limitation:

(i)    the manufacture, construction, ordering, purchase, acceptance or rejection, ownership, titling or retitling, registration or re-registration, delivery, leasing, subleasing, releasing, possession, use, operation, control, management, storage, removal, return, repossession, sale or other disposition of the Aircraft, or any part thereof, including, without limitation, any of such as may arise from (A) loss or damage to any property or death or injury to any Person, (B) patent or latent defects in the Aircraft (whether or not discoverable by the Sublessee or any Indemnitee), (C) any claims based on product liability or strict or absolute liability in tort, (D) any claims based on patent, trademark, trade-name or copyright infringement, or (E) any claims based upon any noncompliance with or violation of any environmental control, noise or pollution laws, rules, regulations or requirements;

(ii)    any inaccuracy of any representation or warranty of the Sublessee, or any failure on the part of the Sublessee to perform or comply with any of the terms of this Agreement or any Operative Document; or

(iii)    any power of attorney issued to the Sublessee to title, retitle, register or reregister an Aircraft, and any charges, civil and criminal violations with respect to an Aircraft, and all penalties and interest applicable thereto;

(iv)    any defect in the Aircraft resulting in costs, expenses, damages or liabilities; or

735890297

(v)     any Default or Event of Default under this Agreement or any other Operative Document.

provided, that the foregoing indemnity shall not extend to any Liability (A) with respect to any particular Indemnitee to the extent determined by a court to result from the willful misconduct or the gross negligence of such Indemnitee; or (B) with respect to any Tax (other than to the extent included in the After-Tax Basis calculation), it being understood that Liability in respect of any Tax (other than to the extent included in the After-Tax Basis calculation) is covered, if at all, by Section 21(b); or (C) imposed with respect to the period after the expiration of the Sublease term set forth herein as such term may be renewed in accordance with the provisions hereof, provided that this clause (C) shall not apply with respect to any Liability related to events occurring or matters arising prior to or simultaneously with the expiration of the term of this Agreement or relating to payments to or for the benefit of an Indemnitee following the expiration of such term. The Sublessee shall satisfy, pay and discharge any and all judgments and fines that may be recovered against the Sublessor in any such action or actions.

(b)     General Tax Indemnity.  The Sublessee agrees to pay, defend and indemnify and hold each Indemnitee harmless on an After-Tax Basis from any and all Taxes imposed by any Federal, state or local government or taxing authority of or in the United States, or by any taxing authority or governmental subdivision of a foreign country, upon or with respect to (a) any Indemnitee, Sublessee, the Aircraft, or any part thereof, or upon or with respect to any Operative Document, the Overall Transaction or the Sublessor, (b) the manufacture, construction, design, ordering, purchase, ownership, financing, delivery, acceptance, rejection, leasing, subleasing, re-leasing, possession, use, maintenance, alteration, modification, registration, re-registration, titling, re-titling, licensing, documentation, repossession, sale, transfer of title, destruction, casualty, accident or other application or disposition of the Aircraft, or any part thereof, (c) the payments, rentals, receipts or earnings arising from the Aircraft, or any part thereof, (d) the execution or delivery of (or the performance, enforcement or amendment of), this Agreement, the Agreement Supplement or any other Operative Document, (e) the payment of Basic Payments and/or Supplemental Payments, (f) the conduct of business or affairs of the Sublessee, or (h) otherwise with respect to or in connection with the transactions contemplated by the Operative Documents or the Overall Transaction; provided, however, that the indemnity provided in this Section 21(b) shall not apply to any Excluded Taxes (such indemnified Taxes hereafter referred to as "Indemnified Taxes"); provided, further, for the avoidance of doubt, the foregoing obligation of Sublessee with respect to Indemnified Taxes shall not give Sublessee the right to join any Indemnitee as a party to any administrative or judicial proceeding without the advance written consent of such Indemnitee.  If any Tax is asserted against or imposed on or with respect to the Sublessor, or any other Indemnitee, or the property or activities of either in connection with this Agreement, the other Operative Documents or the Overall Transaction, unless Sublessee shall acknowledge that such Tax is an Indemnified Tax and agree to indemnify Sublessor and any other applicable Indemnitees in accordance with this Section 21(b), Sublessee shall take such actions as the Sublessor may reasonably request in writing to facilitate the Sublessor's ability to assert its rights under this Section 21(b) on behalf of the Sublessor and the other Indemnitees, including, without limitation, by providing all relevant information to Sublessor with respect to such Tax that is within Sublessee's, the Sublease Guarantor's or any of affiliate of Sublessee and/or the Sublease Guarantor's possession; provided, that no such action shall interfere with the normal business operations of an Operating Party or the operation of the Aircraft.

735890297

Without limiting the obligation and indemnity contained in this Section 21(b), in the event that any withholding or deduction from any payment to be made to or with respect to an Indemnitee in connection with this Agreement, the other Operative Documents or any document or instrument contemplated thereby is required in respect of any Taxes, then the Sublessee will (a) pay or cause to be paid directly to the relevant authority the full amount required to be so withheld or deducted; (b) forward to the affected Indemnitee official receipts or other documentation reasonably satisfactory to such party evidencing such payment to such authority; and (c) except to the extent provided in the following provisions of this Section 21(b), and without duplication of any indemnification required by the preceding provisions of this Section 21(b), with respect to all Indemnified Taxes indemnified for under this Section 21(b), pay to the affected Indemnitee such additional amount or amounts as are necessary to ensure that the net amount actually received by such Indemnitee will equal the full amount such Indemnitee would have received had no such withholding or deduction been required.  Moreover and similarly without limiting the obligation and indemnity contained in this  Section 21(b), if any Indemnified Taxes are imposed on or with respect to an Indemnitee, such Indemnitee may pay or cause to be paid such Indemnified Taxes and except to the extent provided in the following provisions of this Section 21(b), and without duplication of any indemnification required by the preceding provisions of this Section 21(b), the Sublessee will indemnify and hold harmless the Indemnitee on an After-Tax Basis for any such Indemnified Taxes paid, which indemnification obligation shall include reimbursement for any reasonable out of pocket expenses actually incurred by the Indemnitee in connection with the payment of such Indemnified Taxes and receiving the indemnity from Sublessee.

Upon written request, the Sublessee shall furnish the Indemnitee with copies of all paid receipts or other appropriate evidence of payment for all Taxes paid by the Sublessee pursuant to this Section 21(b).  The provisions of this Section 21(b) shall apply from the date of the execution of this Agreement notwithstanding that the Base Term may not have commenced with respect to the Aircraft, and shall survive and continue in full force and effect notwithstanding the expiration or earlier termination of this Agreement in whole or in part, including the expiration or earlier termination of the Base Term with respect to any of the Aircraft.

On or before the date hereof or, if later, the date on which it acquires the rights and obligations of an Indemnitee pursuant to the Operative Documents, each Indemnitee which is not a United States person (within the meaning of Section 7701 of the Code) will deliver to the Sublessee a fully completed and duly executed copy of United States Internal Revenue Service Form W-8BEN, W-8BEN-E or W-8ECI or successor applicable form, as appropriate, confirming that such Indemnitee is entitled under Section 1442 of the Internal Revenue Code or any other applicable provision thereof or under any applicable tax treaty or convention to receive payments under the Operative Documents without deduction or withholding of United States federal income tax.  Until the obligations of the Sublessee under the Operative Documents have been paid and performed in full, each such Indemnitee shall also deliver a further copy of such Form W-8BEN, W-8BEN-E or W-8ECI or any successor forms thereto to the Sublessee on or before expiration or obsolescence of the form previously delivered by such Indemnitee hereunder, or upon the occurrence of any event requiring a change in the most recent such form delivered to the Sublessee unless any change in law or regulation of the United States or any taxing authority thereof has occurred prior to the date on which such delivery would otherwise be required which renders such form inapplicable or which would prevent such Indemnitee from completing and delivering such form.  Notwithstanding anything to the contrary in the Operative Documents, the Sublessee shall

22

not be required to pay any additional amounts or indemnify an Indemnitee pursuant to this <u>Section 21(b)</u> for United States federal withholding taxes (i) to the extent that any obligation to withhold, deduct or pay such withholding taxes existed on the date such Indemnitee became a party to any Operative Document, (ii) imposed on any Indemnitee which has failed to comply with its obligations under this paragraph if such compliance would have permitted the Sublessee to make the relevant payment without any such United States federal withholding obligation, or (iii) that are Excluded Taxes.

(c)     A certificate of any Indemnitee setting forth any amount or amounts which such Indemnitee is entitled to receive pursuant to this <u>Section 21(c)</u>, accompanied by calculations in reasonable detail showing the basis for such amount or amounts, shall be delivered to the Sublessee and shall be conclusive absent manifest error.

(d)     <u>Payments</u>.  Any Tax indemnifiable under <u>Section 21(b)</u> shall be paid by the Sublessee directly when due to the applicable taxing authority if direct payment is practicable and permitted.  If direct payment to the applicable taxing authority is not permitted or is otherwise not made, any amount payable to an Indemnitee pursuant to <u>Section 21(b)</u> shall be paid within three (3) Business Days after receipt of a written demand therefor from such Indemnitee accompanied by a written statement describing in reasonable detail the amount so payable, but in any event not before the date that the relevant Taxes are due.  Any payments made pursuant to <u>Section 21(b)</u> shall be made to the Indemnitee entitled thereto in immediately available funds at such bank or to such account as specified by the payee in written directions to the payor, or, if no such direction shall have been given, by check of the payor payable to the order of the payee by certified mail, postage prepaid at its address as set forth in this Agreement.  Upon the written request of any Indemnitee with respect to a Tax that the Sublessee is required to pay, the Sublessee shall furnish to such Indemnitee the original or a certified copy of a receipt for the Sublessee's payment of such Tax or such other evidence of payment as is reasonably acceptable to such Indemnitee.

(e)     <u>Reports</u>.  In the case of any Tax return or report for which the Sublessee is required to indemnify an Indemnitee under <u>Section 21(b)</u> and of which Sublessee has actual knowledge, the Sublessee shall notify such Indemnitee of the requirement to file such Tax return or report and will promptly provide at the Sublessee's expense each Indemnitee with all information necessary for the making and timely filing of such reports or returns within thirty (30) days prior to the due date of such return or report (or such later date that relevant information becomes reasonably available to the Sublessee) and shall reimburse Sublessor for any reasonable out-of-pocket expenses incurred in connection with the preparation and filing of such reports or returns (or, if any such report or return includes information other than that relating to the Overall Transaction, for a reasonably allocated portion of such expenses).  If an Indemnitee requests in writing that any such reports or returns be prepared and filed by the Sublessee, the Sublessee will duly prepare and file at the Sublessee's expense the same if permitted by Applicable Law to file the same, and if not so permitted, the Sublessee shall duly prepare such reports or returns for signature by the Indemnitee, and shall forward the same, together with immediately available funds for payment of any Indemnified Tax due (as defined in <u>Section 21(b)</u>) to the Indemnitee, at least ten (10) Business Days in advance of the date such payment is to be made.

(f)     <u>Reimbursement for Tax Savings</u>.  If (x) an Indemnitee shall obtain a credit or refund of any Indemnified Taxes paid by the Sublessee pursuant to <u>Section 21(b)</u> or (y) by

reason of the incurrence or imposition of any Tax for which an Indemnitee is indemnified pursuant to Section 21(b) or any payment made to or for the account of such Indemnitee by the Sublessee pursuant to Section 21(b), such Indemnitee at any time realizes a reduction in any Taxes for which the Sublessee is not required to indemnify such Indemnitee pursuant to Section 21(b), which reduction in Taxes was not taken into account in computing such payment by the Sublessee to or for the account of such Indemnitee (having been calculated on an After-Tax Basis), then such Indemnitee shall promptly pay to the Sublessee (xx) the amount of such credit or refund, together with the amount of any interest received by such Indemnitee on account of such credit or refund or (yy) an amount equal to such reduction in Taxes, as the case may be; provided, that no such payment shall be made so long as an Event of Default shall have occurred and be continuing, in which case such amounts shall be applied by Sublessor to satisfy the obligations of Sublessee under the Sublease, after which any remaining amounts shall be paid promptly by the Sublessor to the Sublessee after all Events of Default have been cured and, provided, further, that the amount payable to the Sublessee by any Indemnitee pursuant to this Section 21(f) shall not at any time exceed the aggregate amount of all indemnity payments made by the Sublessee under Section 21(b) to such Indemnitee with respect to the Taxes which gave rise to the credit or refund or with respect to the Tax which gave rise to the reduction in Taxes less the amount of all prior payments made to the Sublessee by such Indemnitee under this Section 21(f) with respect to such credit or refund. Each Indemnitee agrees to act in good faith to promptly claim such refunds and other available Tax benefits, and take such other actions as may be reasonable to minimize any payment due from the Sublessee pursuant to Section 21(b). The disallowance or reduction of any credit, refund or other tax savings with respect to which an Indemnitee has made a payment to the Sublessee under this Section 21(f) shall be treated as a Tax for which the Sublessee is obligated to indemnify such Indemnitee hereunder without regard to any exception for Excluded Taxes.

(g)     Sales and Use Tax.  The Parties agree to cooperate and take reasonable actions (consistent with their respective internal policies and legal and regulatory restrictions and so long as such efforts would not be materially disadvantageous to such Party, as determined in their reasonable discretion) to minimize the amount of any and all sales and use tax imposed as a consequence of the Lessor's purchase of the Aircraft, the Sublessor's lease of the Aircraft and the Sublessor's sublease of the Aircraft.

(h)     Contests.

(i)     If a written claim is made against an Indemnitee or if any proceeding shall be commenced against any Indemnitee (including a written notice of such proceeding), for any Taxes with respect to which the Sublessee may be liable for payment or indemnity hereunder or if any Indemnitee shall determine that any Tax as to which the Sublessee may have an indemnity obligation hereunder shall be payable, such Indemnitee shall promptly notify the Sublessee in writing and shall not take any action with respect to such claim, proceeding or Tax without the consent of the Sublessee for 30 days after the receipt of such notice by the Sublessee; provided, however, that, in the case of any such claim or proceeding (but not in the case of any such determination by the Indemnitee), if action shall be required by law or regulation to be taken prior to the end of such 30-day period, such Indemnitee shall, in such notice to the Sublessee, so inform the Sublessee, and no action shall be taken with respect to such claim or Tax without the consent of

24

the Sublessee before the last Business Day of such shorter period; and provided further that the failure of the Indemnitee to give the notices referred to in this sentence shall not diminish the Sublessee's obligation hereunder except to the extent such failure precludes the ability of the Sublessee to contest such claim. If, within 30 days of receipt of such notice from the Indemnitee (or such shorter period as the Indemnitee has notified the Sublessee is required by law or regulation for the Indemnitee to commence such contest), the Sublessee shall request in writing that such Indemnitee contest the imposition of such Tax, the Indemnitee shall, at the expense of the Sublessee, in good faith contest (including, without limitation, by pursuit of appeals), and shall not settle without the Sublessee's consent (or (i) if such contest must be pursued in the name of the Indemnitee, but can be pursued independently from any other proceeding involving a Tax liability of such Indemnitee, the Indemnitee shall, if the Sublessee requests, allow the Sublessee to control the contest unless, in the good faith judgment of the Indemnitee, such contest by the Sublessee could have a material adverse impact on the business or operations of the Indemnitee, in which case the Indemnitee may control or reassert control of such contest or (ii) in the case of any contest, if the Sublessee requests, the Indemnitee may allow the Sublessee to control the contest), the validity, applicability or amount of such Taxes by, in the sole discretion of the Person conducting such contest (provided that at least five days remain for taking such action after the date of receipt by the Indemnitee of such request), (i) resisting payment thereof, (ii) not paying the same except under protest, if protest is necessary and proper, (iii) if the payment be made, using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings, or (iv) taking such other action as is reasonably requested by the Sublessee from time to time.

(ii)      Notwithstanding the foregoing provisions of this Section 21(h), such Indemnitee shall not be required to take any administrative or judicial or other action and the Sublessee shall not be able to contest such claim or Tax in its own name or that of the Sublessee or the Indemnitee unless (A) the Sublessee shall have agreed to pay, and shall pay, on an After-Tax basis, to such Indemnitee on demand all reasonable out-of-pocket third party costs and expenses that such Indemnitee may incur in connection with contesting such claim or Taxes, including all reasonable legal (including non-duplicative internal counsel), accounting and investigatory fees and disbursements, (B) in the case of a contest controlled by the Indemnitee, the amount of the potential indemnity (taking into account all similar or logically related claims that have been or could be raised in any audit involving such Indemnitee for which the Sublessee may be liable to pay an indemnity under Section 21(b)) exceeds $10,000, (C) the action to be taken will not result in any material imminent danger of sale, forfeiture or loss of the Aircraft or any part or interest therein or risk of criminal liability, (D) if such contest shall involve the payment of the Tax prior to the contest, the Sublessee shall, at its option (and notwithstanding anything herein to the contrary), either (x) pay the Indemnitee for such Taxes (plus any additional amounts calculated in accordance with Section 21(d)) or (y) provide to the Indemnitee an interest-free advance in an amount equal to the Tax which the Indemnitee is required to pay (with no additional net After-

735890297

Tax cost to such Indemnitee), (E) in the case of any contest that is being contested in the name of or which is being controlled by the Indemnitee, the Sublessee shall have provided to such Indemnitee an opinion of independent tax counsel selected by the Sublessee, and reasonably satisfactory to the Indemnitee that a reasonable basis exists to contest such claim, (F) no Event of Default shall have occurred and be continuing, and (G) in the case of a contest controlled by the Sublessee, the Sublessee agrees to indemnify, defend and hold harmless the Indemnitee on an After-Tax basis for any Taxes with respect to such contest except Excluded Taxes. In no event shall an Indemnitee be required to appeal an adverse judicial determination to the United States Supreme Court. The Indemnitee shall consult in good faith with the Sublessee regarding the conduct of any contest controlled by such Indemnitee, shall keep the Sublessee reasonably informed as to the status of the contest and shall consider in good faith all suggestions made by the Sublessee regarding the conduct of any such contest, subject to preserving counsel privilege in the Indemnitee's reasonable judgment. Notwithstanding anything to the contrary contained herein the parties agree that an Indemnitee may at any time decline to take any action with respect to the contest of any claim for a Tax and may settle such claim, if such Indemnitee shall waive its rights to any indemnity from the Sublessee that otherwise would be payable in respect of such claim and shall pay to the Sublessee any amount previously paid or advanced by the Sublessee pursuant to Section 21(b) other than clause (A) of this paragraph (by way of indemnification or advance for the payment of an Indemnified Tax) with respect to such Taxes.

(iii)    Notwithstanding anything contained in this Section 21 (h)) to the contrary, the Indemnitee shall not be required to contest any claim if the subject matter thereof shall be of a continuing nature and shall have previously been decided adversely by a court of competent jurisdiction pursuant to the contest provisions of this Section 21(h), unless there shall have been a change in law (or interpretation thereof) after the date with respect to which such previous contest shall have been decided, and the Indemnitee shall have received, at the Sublessee's expense, an opinion of independent tax counsel selected by the Sublessee and reasonably acceptable to such Indemnitee to the effect that as a result of such change in law (or interpretation thereof), there is substantial authority that the Indemnitee will prevail in such contest.

(iv)    If an Indemnitee shall fail to perform its obligations under this Section 21(h), such failure shall not discharge, diminish or relieve the Sublessee of any liability for indemnification that it may have to such Indemnitee hereunder, unless the contest of a claim is precluded as a result of such failure; provided that any payment by the Sublessee to such Indemnitee pursuant hereto shall not be deemed to constitute a waiver or release of any right or remedy (including any remedy of damages) that the Sublessee may have against such Indemnitee if as a result of such failure the Sublessee's ability to contest the claim is adversely affected.

SECTION 22.   Leasing.  The Sublessee will not, without the prior written consent of the Sublessor (which may be withheld in its sole discretion) assign any of its rights hereunder or lease,

735890297

sublease or grant the right to use, or otherwise relinquish possession or control of, the Airframe or any Part or Engine: provided, that the Sublessee may provide possession, use and control of the Aircraft to a Part 135 Operator, and pursuant to arrangements, in each case satisfactory to the Sublessor in its reasonable discretion). Any attempted assignment, lease or other transfer by Sublessee in violation of this Agreement or the other Operative Documents will be void. So long as Sublessee shall comply with the obligations set forth in Section 20 herein, the Sublessee may deliver possession of the Aircraft for service, repair, maintenance or overhaul work or for alterations or modifications in or additions to the Aircraft to the extent required or permitted by the terms of this Agreement.

SECTION 23.   Sublessee Acknowledgement and Agreement. The Sublessor intends to assign this Agreement to the Lessor as security for the Sublessor's obligations under the Lease, and the Lessor intends to further assign this Agreement to the Lender as security for the Lessor's obligations under the Loan Agreement. The Sublessee hereby consents to such assignments, and agrees to pay directly to the Lender (or, after receipt of notice by the Sublessee from the Lender that the Lessor's obligations under the Loan Agreement have been discharged in full, to the Lessor, or, after receipt of notice by the Sublessee from the Lessor that the Sublessor's obligations under the Lease have been discharged in full and the Sublessor has acquired the Aircraft, to the Sublessor) all amounts owing by the Sublessee hereunder, including any deposits required to be made pursuant to Section 12.

SECTION 24.   Events of Default. Each of the following events, whether or not caused by or within the control of Sublessee, shall constitute an "Event of Default" under this Agreement:

(a)     the Sublessee shall fail to make payment of any Required Payment (other than a Supplemental Payment) or Termination Value, as applicable, as and when the same becomes due and payable;

(b)     the Sublessee shall fail to make payment of any Supplemental Payment as and when the same becomes due and payable and such failure continues for five (5) Business Days after receipt of written notice;

(c)     one or more judgments or decrees shall be entered against the Sublessee or the Sublease Guarantor involving in the aggregate, a liability (not paid or fully covered by insurance) of $50,000,000.00 or more with respect to any Operating Party and all such judgments or decrees shall not have been vacated, dismissed, discharged, bonded or stayed within thirty (30) days from the entry thereof;

(d)     the Sublessee shall fail to perform or observe any covenant, condition or agreement (other than those referred to in (a), (b) or (f)) required to be performed or observed by it under this Agreement or other Operative Document, and such failure continues for ten (10) days after the earlier of the Sublessee's actual knowledge thereof or receipt of written notice; provided, that if such failure is capable of being remedied and the Sublessee is diligently pursuing such remedy, such failure shall not constitute an Event of Default unless the same shall not have been remedied for a period of thirty (30) days after receipt of written notice of such Default by the Sublessee; or

27

735890297

(e)     the Sublessee shall default in any of its obligations under Section 20;

(f)     any representation or warranty made by the Sublessee in this Agreement or any other Operative Document or in any statement or certificate furnished to the Sublessor pursuant to or in connection herewith shall be false or misleading in any material respect when made or given; provided, that if such incorrect in any material respect representation or warranty is capable of being remedied and the Sublessee is diligently pursuing such remedy, such incorrect representation or warranty shall not constitute an Event of Default unless the same shall continue to be incorrect and shall not have been remedied for a period of thirty (30) days after receipt of written notice thereof by the Sublessee;

(g)     the Sublessee (i) becomes insolvent, or (ii) files any application or petition in any tribunal for the appointment of a receiver or trustee for all or a significant portion of its assets, or (iii) commences any proceeding under any bankruptcy or reorganization statute or under any provision of the U.S. Bankruptcy Code or under any dissolution or liquidation law whether now or hereafter in effect or (iv) makes an assignment for the benefit of creditors or is adjudicated bankrupt;

(h)     an involuntary case or other proceeding shall be commenced against the Sublessee seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and, if such proceeding is being contested in good faith, such involuntary case or other proceeding shall (A) result in the entry of an order for relief or any such adjudication or appointment or (B) continue undismissed and unstayed for a period of sixty (60) consecutive days;

(i)     the Sublessee shall (i) default beyond any applicable period of grace in any payment of principal of or interest on any indebtedness for any borrowed money for the Sublessee is liable in a principal amount then outstanding of $50,000,000.00 or more or (ii) an event of default (other than a failure to pay principal or interest) as defined in any mortgage, indenture, agreement or instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for any borrowed money for which the Sublessee is liable in a principal amount then outstanding of $50,000,000.00 or more shall happen and shall result in such indebtedness becoming or being declared due and payable prior to the date on which it could otherwise become due and payable;

(j)     the Lender, the Lessor or the Sublessor shall at any time cease to have a valid and perfected (in the case of the Lender, first priority) security interest in the Aircraft, subject to no Liens other than any Permitted Liens and such failure shall continue unremedied or unbonded for ten (10) days; or

(k)     the Sublease Guaranty shall not be in full force and effect.

**SECTION 25.**   Remedies.   (a)   If an Event of Default specified in Section 24(h) or (i) above occurs, then automatically and without any declaration or other action by the Sublessor or any other Person, this Agreement shall be in default and the Sublessee will immediately pay to the

735890297

Sublessor the aggregate Termination Value for the Aircraft together with (without duplication) all accrued and unpaid Required Payments and all other sums (including costs and expenses) due and payable to the Sublessor hereunder together with interest on each such amount at the Late Payment Rate (such amount with interest being the "Default Payment Amount"). Upon the occurrence and during the continuance of any other Event of Default, the Sublessor may declare this Agreement to be in default by making written demand on the Sublessee for payment of the Default Payment Amount, and the Sublessee shall pay to the Sublessor, on the date set forth in such demand, an amount equal to the Default Payment Amount.  Upon the occurrence and during the continuance of any Event of Default and the payment by the Sublessee of the Default Payment Amount, the Sublessor shall, pursuant to a written instrument, convey to the Sublessee the Aircraft without recourse or warranty (except as to the absence of Sublessor Liens), in an "as-is, where-is" condition," free and clear of all Sublessor Liens.

(b)     If an Event of Default has occurred and is continuing, then the Sublessor may, in addition to, and not in limitation of, any remedy referred to in Section 25(a) at its option, declare this Agreement to be in default under this Section 25(b) by written notice to such effect given to the Sublessee, and at any time thereafter, but subject to the last sentence of Section 25(a), the Sublessor may exercise one or more of the following remedies with respect to all or any Part of the Aircraft, as the Sublessor in its sole discretion shall elect, all at the sole expense of the Sublessee:

(i)     proceed by appropriate court action, either at law or in equity, to enforce performance by the Sublessee of the applicable covenants of this Agreement or to recover damages for the breach thereof;

(ii)     by written notice to the Sublessee cancel this Agreement or terminate the Sublessor's obligations hereunder whereupon all rights of the Sublessee to the use of the Aircraft or any part thereof will terminate, but the Sublessee will remain liable to the extent herein provided;

(iii)     if so requested by the Sublessor, the Sublessee will at its sole expense promptly return the Aircraft to the possession of the Sublessor at such place as the Sublessor designates;

(iv)     the Sublessor may enter upon the premises where all or any of the Aircraft or any Part thereof is located to take immediate possession of and remove the same together with either Engines and Parts, by summary proceedings or otherwise, so long as any such entry does not cause or result in a breach of the peace;

(v)     the Sublessor may sell (if the Lessor's obligations under the Loan Agreement have been discharged in full and the Sublessor's obligations under the Lease have been discharged in full and the Sublessor has acquired the Aircraft under each Residual Value Guaranty) or lease all or any of the Aircraft, either Engine or any Part, at public auction or by private lease at such terms as Sublessor may determine in its sole discretion, free and clear of any rights of the Sublessee

29

with not less than ten (10) Business Days prior written notice to the Sublessee thereof which is agreed to constitute reasonable notice thereof to the Sublessee;

(vi)    the Sublessor may exercise any and all rights and remedies available to a creditor or assignee under the Cape Town Agreements (including, but not limited to the rights and remedies of a creditor and/or chargee under Articles 8, 9, 10, 12 and 13 of the Convention, and Articles IX and XIII of the Protocol and as an assignee under Article 34 of the Convention, as applicable); and

(vii)    the Sublessor may exercise any and all rights accruing to a secured party and creditor in the event of a default by the Sublessee under any Applicable Law.

(c)    To the extent that all Required Payments then due and payable to the Sublessor with respect to all or any of the Aircraft and the aggregate Termination Payment have not been previously paid, the Sublessee will forthwith pay to the Sublessor the amount thereof in full.  Any repossession or subsequent sale (to the extent permitted hereunder) or lease (or exercise of other remedy) by the Sublessor or any other Person of all of any of the Aircraft will not bar any action for a deficiency as herein provided, and the bringing of an action or the entry of judgment against the Sublessee will not bar the Sublessor's right to repossess the Aircraft.

(d)    No remedy referred to herein is intended to be exclusive, but each will be cumulative and in addition to any other remedy referred to above or otherwise available at law or in equity.  No waiver of any Event of Default hereunder will in any way be, or be construed to be, a waiver of any future or subsequent Event of Default.  The failure or delay of the Sublessor or any other Person in exercising any rights granted it hereunder upon any occurrence and during the continuance of any Event of Default set forth herein will not constitute a waiver of any such right upon the continuation or recurrence of any such Event of Default or any other Event of Default and any single or partial exercise of any particular right by the Sublessor will not exhaust the same or constitute a waiver of any other right provided herein.

SECTION 26.  Notices.  All communications and notices provided herein will be in writing and will become effective on the day after having been deposited with a nationally recognized overnight courier service, addressed, if to the Sublessee or Sublessor, at their respective addresses set forth below or such other address as any party may hereafter designate by written notice to each of the other parties.

If to the Sublessee:

Wing Spirit Inc.
55 Merchant Street, Suite 1600
Honolulu, HI 96813
Attn: Chief Legal Officer
Email: sean.chu@wingspirit.com

If to the Sublessor:

735890297

Honda Aircraft Company, LLC
6430 Ballinger Road
Greensboro, NC  27410 USA
Attention: contracts@haci.honda.com

With a copy to:

MAS One USA LLC
3420 South Ocean Blvd
# 10 T
Highland Beach, FL 32487
Attn: Douglas Brennan
Email: douglas.brennan@gmail.com

With a copy to:

Bank of Utah, as Owner Trustee
50 South 200 East, Suite 110
Salt Lake City, Utah 84111
Attn: Corporate Trust Services
Fax: (801) 924-3630
Email: corptrust@bankofutah.com

**SECTION 27.**   Successors and Assigns.  The Sublessor may not assign, sell or otherwise transfer all or any portion of the aggregate Termination Payment, the Required Payments or its interest in the Aircraft, this Agreement and/or any of the other Operative Documents, in each case, without the prior written consent of the Sublessee, such consent not to be unreasonably withheld, conditioned or delayed; provided, that Sublessee's consent shall not be required if an Event of Default shall have occurred and be continuing.  Sublessee may not assign its interest in this Agreement and any other Operative Document without the Sublessor's prior written consent. Provided that, in the case of an assignment by the Sublessor, no Event of Default has occurred and is continuing, the assigning party agrees to reimburse the other party for all costs, fees and expenses, included reasonable and documented fees and expenses of such other party's counsel incurred in connection with any such sale, assignment, grant of security interest or leveraged transaction entered into by the assigning party.  Any assignment in breach of this Section 27 shall be void.

**SECTION 28.**   Performance of Obligations of the Sublessee by the Sublessor. If an Event of Default occurs and is continuing hereunder, the Sublessor may thereafter make the payment or perform or comply with this Agreement, the nonpayment, nonperformance or noncompliance with which caused such Event of Default, and the amount of such payment and the amount of reasonable expenses of the Sublessor incurred in connection with the performance of or compliance with such provision of this Agreement, as the case may be, together with interest at the Late Payment Rate, will be payable by the Sublessee upon demand by the Sublessor, and such action by the Sublessor will not be deemed a cure or waiver of any Default or Event of Default hereunder until payment of such amount has been made by the Sublessee.

31

735890297

**SECTION 29.**   Further Assurances.   The Sublessee will, at its expense, promptly and duly execute and deliver to the Sublessor such further documents and assurances to take such further action as the Sublessor may from time to time reasonably request in writing in order to more effectively carry out the intent and purpose of this Agreement and the Overall Transaction and to establish and protect the rights and remedies created or intended to be created in favor of the Sublessor hereunder and thereunder, including without limitation, if reasonably requested by the Sublessor in writing, the execution and delivery of UCC financing statements or any filing with the FAA or other Governmental Authority, in recordable form subjecting this Agreement, the Aircraft and any replacement Engine to the rights of the Sublessor under this Agreement in accordance with the laws of such jurisdictions as the Sublessor may from time to time deem advisable.

**SECTION 30.**   Purchase Option; Return and Return Conditions.   (a) Purchase Option.   If this Agreement shall not have been earlier terminated in accordance with its terms, and provided no Event of Default shall have occurred and be continuing and that the Lessor has not elected to require the Sublessor, as guarantor, to repurchase the Aircraft under the terms of the Residual Value Guaranty, the Sublessee shall have the option, on the Base Term Expiry Date, to purchase the Aircraft.   The Sublessee shall, no later than the date that is forty-five (45) days prior to the Base Term Expiry Date, provide the Sublessor with irrevocable written notice of the Sublessee's intent to so purchase.   Any such purchase of the Aircraft shall be made pursuant to Section 30(b).

(b)     Purchase Obligation.   In the event that the Lessor elects to require the Sublessor, as guarantor under the Residual Value Guaranty, to repurchase the Aircraft upon either (i) the expiration of the Lease, or (ii) an Event of Default under the Lease, the Sublessor shall have the right upon written demand from the Sublessor to the Sublessee to require the Sublessee to purchase the Aircraft under the same terms and conditions that the Sublessor has agreed to under the terms of the Residual Value Guaranty.

(c)     Purchase Option Payment.   Upon any determination to purchase the Aircraft pursuant to Section 30(a), the Sublessee shall pay to the Sublessor on the date fixed for such purchase an amount equal to the sum of, without duplication: (i) all Required Payments then due and owing under this Agreement, plus (ii) any sales and other Taxes due or payable in connection with the sale of the Aircraft by the Sublessor to the Sublessee or to any Person designated by the Sublessee, plus (iii) the Termination Value for the Aircraft.   Upon receipt of the amounts set forth in the preceding sentence, Sublessor shall release its security interest (and cause the Lender to release its security interest) in the Aircraft, shall exercise its purchase option under the Lease and shall convey all of the Sublessor's rights and interest in the Aircraft, including the warranties of the Manufacturer, to the Sublessee or to any Person designated by the Sublessee on an "AS IS, WHERE IS" BASIS WITHOUT REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, and without representation, warranty or recourse to the Sublessor or any other Indemnitee (express or implied) except for the absence of Sublessor Liens.   Payment of the foregoing shall not limit or otherwise affect any indemnity obligation of the Sublessee which is not satisfied in full by the date of such payment.

(d)     Return and Return Conditions.   In the event that the purchase option in Section 30(a) is not exercised on the Base Term Expiry Date, the Sublessee shall cause each Aircraft to be returned to the Sublessor in compliance with the conditions required under the

32

applicable Residual Value Guaranty, a copy of which has been delivered. Such conditions are hereby incorporated herein as though set forth herein in full.

SECTION 31.  Miscellaneous.  (a)  Survival; Successors and Assigns.  All agreements, representations and warranties contained in this Agreement or any Operative Document delivered by the Sublessee and the Sublessor will survive the execution and delivery of this Agreement.  All indemnities contained herein will survive the expiration or earlier termination of this Agreement. The provisions of this Agreement will be binding upon, and inure to the benefit of, the successors and permitted assigns of the Sublessor and the successors and permitted assigns of the Sublessee.

(b)  Tax Treatment.  It is hereby agreed by the parties hereto that (a) for United States federal, state and local income and franchise tax purposes, it is intended that (i) the Purchase Agreement shall convey the entire economic interest in the Aircraft to the Lessor, (ii) the Lessor shall be treated as the owner of the Aircraft, and (iii) the Lease shall be treated as a true lease (and not as a conditional sale) under which the Lessor shall be treated as the lessor of the Aircraft, and (b) the Sublessee will not take a position contrary to the positions and intentions contained in clause (a) above in any U.S. federal, state or local income or franchise tax return that may be filed by the Lessee.

(c)  No Consequential Damages.  Notwithstanding anything to the contrary in this Agreement or any other Operative Documents, in no event shall any party hereto have any liability for special, indirect or consequential damages resulting from or arising out of this Agreement or any of the other Operative Documents or the Overall Transaction, including, without limitation, loss of profits or business interruption, however the same may be caused.

(d)  Severability.  Any provision of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Law, each Operating Party and the Sublessor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.  The terms and conditions of this Agreement have been negotiated in good faith by the parties, and no rule of construction resolving any ambiguity against a drafting party will apply.

(e)  Entire Agreement.  This Agreement, Agreement Supplement and the other Operative Documents and all Schedules and Exhibits thereto executed by the Sublessor and the Sublessee constitute the entire, complete and exclusive statement of the terms of the agreement between the parties hereto with respect to the Aircraft and the Overall Transaction. No express or implied waiver by the Sublessor of any Event of Default hereunder will in any way be, or be construed to be, a waiver of any future or subsequent Event of Default whether similar in kind or otherwise.  No term or provision of this Agreement may be changed, waived, altered, modified, amended, rescinded, supplemented or terminated except by a written agreement signed by the Sublessor, and Sublessee.

(f)  Counterparts.  This Agreement may be executed by the parties hereto on any number of separate counterparts, each of which when so executed and delivered will be an

33

original, but all such counterparts will together constitute but one and the same instrument. Delivery of an executed signature page hereto by facsimile or other electronic means shall be equally effective as delivery of an originally executed signature page.

(g)   Headings.  The division of this Agreement into subsections, the provision of a table of contents and the insertion of headings are for the convenience of reference only and will not affect the construction or interpretation of this Agreement.

(h)   Expenses.  Each Party shall, whether or not the transactions contemplated herein are consummated, pay all reasonable out-of-pocket costs and expenses incurred by such Party in connection with the negotiation, preparation, reproduction, execution and delivery of the Operative Documents, including all reasonable fees and disbursements of its respective counsel. The Sublessee will pay the reasonable and documented costs of FAA Counsel.  In addition, the Sublessee agrees to pay or reimburse or cause to be paid or reimbursed the Sublessor for all other reasonable out-of-pocket costs and expenses, including reasonable and documented attorneys' fees incurred in connection with entering into or giving or withholding any future amendments, supplements, waivers or consents with respect to this Agreement or any other Operative Document.  The Sublessee further agrees to pay or reimburse or cause to be paid or reimbursed the Sublessor for all other reasonable out-of-pocket costs and expenses, including the reasonable and documented attorneys' fees incurred in connection with (a) the negotiation and documentation of any amendments, modifications, restructuring or "workout" (whether or not consummated) of this Agreement, any other Operative Document, and the transactions contemplated hereby during the pendency of an Event of Default, (b) the enforcement of rights or remedies under this Agreement or any Operative Document or (c) any transfer by the Sublessor of any interest in this Agreement or any other Operative Document during the existence and continuance of an Event of Default.

(i)   Jurisdiction.  **THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT EXCLUDING TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ALL OTHER CONFLICTS OF LAWS PRINCIPLES AND CHOICE OF LAW RULES OF THE STATE OF NEW YORK.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT.**

(j)   Grant of Security Interest.

(1)   As collateral security for the prompt and complete payment and performance as and when due of all the debts, duties, liabilities and obligations of the Sublessee hereunder and under the Agreement Supplement and Operative Documents (including, without limitation, all Basic Payments, Supplemental Payments, Termination Payments and payments of the Termination Value), the Sublessee hereby assigns, pledges, transfers, grants, conveys and hypothecates to the Sublessor for its benefit, a continuing security interest, international interest (as defined in the Cape Town Agreements) and lien (subject to Permitted Liens) in and to, all of its present and future right, title and interest in, to and under the following

34

(collectively, the "Collateral"): (A) each of the Aircraft, Engine and Part, additions, attachments and accessions thereto and any and all replacements and substitutions thereto installed or incorporated in or attached to the Aircraft; (B) all Logs in respect of the Aircraft, the Airframe, either Engine or any Part, (C) any and all warranty or other claims the Sublessee may have against any Manufacturer, either Engine manufacturer or any supplier, vendor or other facility providing parts or services in respect of the Aircraft, either Engine or any Part, in each case, to the extent permitted, and subject to any consent required, under any contract, agreement or other instrument with the Manufacturer or other manufacturer, supplier, vendor or other Person, (D) any and all other agreement(s) respecting the Aircraft, and Sublessee's rights to receive, either directly or indirectly, from any party or person, any payments or performance obligations due under such agreement(s) and any Associated Rights and International Interests (and the right to discharge said in International Interests) created by or through such agreements(s); (E) all moneys paid to or deposited with the Sublessor or the Lender and any right to the return or repayment thereof, pursuant to and with regard to the Collateral, this Agreement, and any of the other Operative Documents, and (F) all insurance proceeds and any and all other Proceeds from any or all thereof. "Proceeds" shall have the meaning ascribed to it under the UCC as in effect in the State of New York from time to time, and, in any event, shall include, but not be limited to, (X) any and all proceeds of any insurance, indemnity, warranty or guarantee payable to the Sublessee from time to time with respect to any of the Collateral, (Y) any and all payments (in any form whatsoever) made or due and payable to the Sublessee from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority or any other Person (whether or not acting under color of governmental authority), and (Z) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

(2)     The Sublessee further agrees that at any time and from time to time, at the reasonable expense of the Sublessee, the Sublessee will promptly execute and deliver or cause to be executed and delivered all further instruments, and documents and take all further action that may be necessary that the Sublessor may request, to perfect and protect any security interest granted or purported to be granted hereby or under the Lease or the Security Agreement or to enable the Sublessor, the Lender or the Lessor to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Sublessee will execute and file or cause to be executed and filed such financing statements (including, without limitation, amendments thereto and continuation statements thereof), assignments, short form security agreements and other documents and instruments, and do all such other acts relating to the Collateral and the Sublessor's interests therein as the Sublessor may reasonably request in writing; and will not file or permit to be filed any financing statement, filing with any Governmental Authority, title or other security document (or amendment thereto or continuation statement thereof) with respect to, or affecting, any of the Collateral not naming the Sublessor as the only secured party except with respect to any such filing related to a Permitted Lien.

(3)     Upon the occurrence and during the continuance of an Event of Default, the Sublessor shall be entitled to all remedies of a lessor and/or secured creditor in default under Article 2A and/or 9, as applicable of the New York UCC, as well as to all other rights and remedies provided by law, equity, contract or otherwise.

**SECTION 32.**  Certain Special Provisions.  (a)  No recourse (except as to rights assigned pursuant hereto and to proceeds, collections, payments and recoveries with respect to the Operative Documents and the Overall Transaction) shall be had for the payment of any amount owing in respect of any obligation or claim arising out of or based upon this Agreement or any other Operative Document against the Sublessor or against any stockholder, employee, officer, director or incorporator of the Sublessor; provided, however, that the foregoing shall not relieve any such Person or entity from any liability they might otherwise have arising from his, her or its gross negligence, willful misconduct, intentional breach or intentional misrepresentation.

(b)  It is expressly agreed by the parties hereto that this Agreement shall not be amended, supplemented, restated or otherwise modified without the prior written consent of the Sublessee and the Sublessor.

[Signature Pages Follow]

\* \* \*

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

**IN WITNESS WHEREOF,** the parties hereto have each caused this Aircraft Sublease Agreement to be duly executed by their respective officers thereunto duly authorized.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name:   Claude Draillard
Title:   Vice President

*Sublease Agreement*

735890297

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:    Sean I. Chu

Title:    Senior VP and Chief Legal Officer

*Sublease Agreement*

735890297

**SCHEDULE 1**

INSURANCE REQUIREMENTS

A.      Liability Insurance

Subject to the rights of the Sublessee under Section F of this Schedule 1, the Sublessee shall, without expense to the Sublessor, maintain or cause to be maintained in effect at all times with Approved Insurers, public liability insurance (including, without limitation, aircraft third party, passenger legal liability, property damage, war liability, general third party legal liability, product liability coverage and war risk, hijacking and allied perils coverage but excluding manufacturer's product liability coverage) with respect to the Aircraft in an amount not less than $100,000,000. Such insurance policies shall be of the type usually carried with respect to similar aircraft and engines, and covering risks of the kind customarily insured against by the such insurance policies; provided, that the amount of coverage per occurrence shall be no less than $100,000,000.

B.      Hull Insurance

Subject to the rights of the Sublessee under Section F of this Schedule 1, the Sublessee shall, without expense to the Sublessor  maintain or cause to be maintained in effect at all times with Approved Insurers (i) all risk ground and flight hull and spares insurance and (ii) all risk ground and flight hull and spares war insurance, in each case covering the Aircraft for an amount at all times (even when the Aircraft are grounded or in storage) not less than $110% of the Termination Payment which would be due at such time. A "50/50" clause shall be included in both the hull and hull war policies if written in separate policies. Such insurance shall not provide any insurer with a right to replace any Airframe or Engine with another airframe or engine. Such hull insurance or other insurance of the Sublessee shall cover Engines and Parts temporarily removed from an Airframe, pending replacement by installation of the same or similar Engines or Parts on such Airframe in accordance with Section 14 and Section 15 of the Agreement. Such insurance policies shall be of the type usually carried with respect to similar aircraft and engines, and covering risks of the kind customarily insured against by the such insurance policies; provided, that the amount of coverage per occurrence shall not at any given time less than $110% of the Termination Payment which would be due at such time.

Any policies of insurance carried in accordance with this Section B covering the Aircraft and any policies taken out in substitution or replacement for any such policies (i) shall name the Lender as exclusive loss payee for any proceeds to be paid under such policies and (ii) shall provide that (A) if an Event of a Loss with respect to the Aircraft occurs, the proceeds in respect of such Event of Loss shall be payable to the Lender and (B) the entire amount of any loss with respect to the Aircraft involving proceeds of $50,000 or less or the amount of any proceeds of any loss in excess of the Termination Payment for the Aircraft shall be paid to the Sublessee or its designee; provided, that if any Event of Default shall have occurred and be continuing and the insurers have been notified thereof by the Sublessor or the Lender such payment referred to in clause (B) shall be made as provided in clause (i) above; provided, further, that, subject to the terms of this Agreement, at such time as there shall not be continuing any Event of Default, any of the foregoing amounts so held that have not otherwise been applied as contemplated herein shall be paid to the

735890297

Sublessee.  In the case of a loss with respect to an engine (other than an Engine) installed on an Airframe, the Sublessor and/or Lessor, as the case shall be, shall hold any payment to it of any insurance proceeds in respect of such loss for its account, the Sublessee or any other third party that is entitled to receive such proceeds.

C.      General Provisions

        The Sublessee shall cause all policies of hull insurance carried in accordance with Sections A and B of this Schedule I, to name the Lender as loss payee and all policies of liability insurance to name each Indemnitee as an additional insured.  Such policies shall provide with respect to each Indemnitee as an additional insured that (i) none of such Indemnitee's interest in such policies shall be invalidated by any act or omission or breach of warranty or condition contained in such policies by the Sublessee; (ii) no cancellation or lapse of coverage for nonpayment of premium or otherwise, and no substantial change of coverage which adversely affects the interests of such Indemnitee, shall be effective as to such Indemnitee until thirty (30) days (or such lesser period as may be applicable in the case of any war risk, hijacking and allied perils insurance coverage) after receipt by the related Approved Insurer of written notice from the insurers of such cancellation, lapse or change; (iii) such Indemnitee shall have no liability for premiums, deductibles, commissions, calls, assessments or advances with respect to such policies (for all of which the Sublessee shall be liable); (iv) such policies will be primary without any right of contribution from any other insurance carried by such Indemnitee; (v) the insurers waive any rights of set-off, counterclaim, deduction or subrogation (except for with respect to outstanding premium) against such Indemnitee; (vi) such policies shall apply worldwide and have no territorial restrictions or limitations and (vii) to the extent that Sublessee reinsures, shall be effected through insurers and brokers of international standing and repute in the London or U.S. markets and/or other recognized and customary markets  or such other arrangement as may be acceptable to the Sublessor and agreed in writing between the Sublessor and the Sublessee. If the insurance required hereby is effected other than through insurers and brokers of international standing and repute in the London or U.S. markets and/or other recognized and customary markets, at least one hundred percent (100%) of the coverage will be reinsured on the international aviation insurance market and such reinsurance shall include a "cut-through" clause (to the extent permitted by applicable law) in form and substance acceptable to the Sublessor. Each liability policy shall provide that all the provisions thereof, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured and provide that the exercise by the insurer of rights of subrogation derived from rights retained by the Sublessee will not delay payment of any claim that would otherwise be payable but for such rights of subrogation.

D.      Reports and Certificates; Other Information

        The Sublessee will furnish or cause to be furnished to the Sublessor and the Lender (A) on or prior to each Delivery Date insurance certificates describing in reasonable detail the insurance maintained by the Sublessee as required pursuant to this Schedule I with respect to the Aircraft being delivered on such Delivery Date, (B) prior to the cancellation, lapse or expiration of the insurance policies required pursuant to this Schedule I, evidence of renewal of such insurance policies, and a copy of the renewed or new insurance policies with all endorsements not later than ten (10) days after any such cancellation, lapse or expiration, and (C) on or prior to each Delivery Date and on or before the renewal dates of the insurance policies carried by the Sublessee pursuant

735890297

to this Schedule 1, a report signed by the applicable Approved Insurer stating the opinion of such Approved Insurer that all premiums in connection with the insurance then due have been paid and the insurance then carried and maintained on the Aircraft complies with the terms hereof and, in the case of renewal insurance, that such renewal insurance will on and after the effective date thereof so comply with the terms hereof (except that such opinion shall not be required with respect to war risk insurance provided by the FAA); provided, that all information contained in such report shall be held confidential by the Sublessor and the Lender.  The Sublessee will instruct or cause the Sublessee to instruct such Approved Insurer to give prompt written advice to the Sublessor and the Lender of any default in the payment of any premium and of any other act or omission on the part of the Sublessee of which it has knowledge and which would in such Approved Insurer's opinion invalidate or render unenforceable, in whole or in any material part, any insurance on the Aircraft.  The Sublessee will also instruct or cause the Sublessee to instruct such Approved Insurer to advise the Sublessor and the Lender in writing at least thirty (30) days prior to the termination or cancellation of (but not scheduled expiration of), or material adverse change in, such insurance carried and maintained on the Aircraft pursuant to this Schedule 1.

E.      Right to Pay Premiums

        The Sublessor, the Lessor and the Lender shall have the rights but not the obligations of an additional named insured.  Neither the Sublessor, the Lessor nor the Lender shall have any obligation to pay any premium, commission, assessment or call due on any such insurance (including reinsurance).  Notwithstanding the foregoing, in the event of cancellation of any insurance due to the nonpayment of premiums, each of the Sublessor, the Lessor and the Lender shall have the option, in its sole discretion, to pay any cash premium in respect of the Aircraft that is due in respect of the coverage pursuant to this Agreement and to maintain such coverage, as the Sublessor, the Lessor or the Lender may reasonably require, until the scheduled expiry date of such insurance and, in such event, the Sublessee shall, upon demand, reimburse the Sublessor, the Lessor or the Lender, as the case may be, amounts so paid by it.

F.      Continuation of Insurance

The Sublessee will, or will procure that any sublessee will, maintain liability insurance (products liability) after, as the case may be (a) the Base Term Expiry Date, (b) the termination of this Agreement or (c) the effective date of any transfer by the Lessor and/or the Sublessor and/or any beneficial owner thereof of its interest in the Aircraft and this Agreement to cover the Sublessee's continuing liability under the indemnities in this Agreement for a period of two (2) years or until completion of the next 600 hour inspection on the Aircraft, whichever occurs sooner.

Each Indemnitee (as advised to the Sublessee in writing by the Sublessor from time to time), at the Sublessee's cost and expense, will be named as additional insured under the insurance maintained in accordance with the immediately preceding paragraph and neither the Sublessee nor any sublessee ceasing to lease the Aircraft, nor such Indemnitee ceasing to have any interest in it, will affect the Sublessee's obligations under this Section F.

G.      Failure to Insure

Without limiting the provisions of <u>Section 20</u> of this Agreement or of the other provisions of this <u>Schedule I</u>, if the Sublessee fails to insure or procure that the Aircraft is insured in accordance with this Agreement, it shall immediately notify the Sublessor and:

(i) any Indemnitee may (but shall not be obligated to) pay outstanding premiums or effect alternative insurance in respect of the Aircraft and any cost incurred by an Indemnitee in the exercise of this right will be reimbursed by the Sublessee on demand; and

(ii) the Sublessor may (but shall not be obligated to) require the Aircraft to be grounded at an airport of its choice and to remain there until it is once again insured in accordance with this Agreement.

Schedule I

## EXHIBIT A

### DEFINITIONS

(a)    The following terms shall have the following meanings for all purposes of the Operative Documents referred to below, unless otherwise defined in an Operative Document or the context thereof shall otherwise require and such meanings are equally applicable both to the singular and plural forms of the terms defined. All capitalized terms used herein and not defined herein shall have the meanings set forth in the Lease, *mutatis mutandis*. Any term defined below by reference to any agreement or instrument shall have such meaning whether or not such agreement or instrument is in effect. The terms "hereof," "herein," "hereunder" and comparable terms refer to the entire agreement with respect to which such terms are used and not to any particular Section, subsection, paragraph or other subdivision thereof.

(b)    Unless the context otherwise requires or the definition expressly provides otherwise, references to (i) agreements shall include sections, schedules, exhibits and appendices thereto and shall be deemed to mean and include such agreements (and sections, schedules, exhibits and appendices) as the same may be amended, supplemented and otherwise modified from time to time in accordance with the terms thereof, (ii) parties to agreements or government agencies shall be deemed to include the successors and permitted assigns of such parties and the successors and assigns of such agencies and (iii) laws or regulations shall be deemed to mean such laws or regulations as the same may be amended from time to time and any superseding laws or regulations covering the same subject matter.

(c)    Unless otherwise specified herein or in any Operative Document, all accounting terms used in any Operative Document shall be interpreted, all accounting determinations made pursuant to the terms of any Operative Documents shall be made, and all financial statements delivered pursuant to the terms of any Operative Document shall be prepared in accordance with GAAP.

(d)    The following terms have the following meanings for all purposes of the Agreement:

"Abatements" has the meaning set forth in Section 11 of this Agreement.

"Administrative User" means, in relation to any person, the person appointed by, or on behalf of, such person to carry out the functions of an administrator of a register user entity under section 5 of the procedures for the International Registry, as issued by the Supervisory Authority.

"ADs" means any FAA Airworthiness Directive.

"After-Tax Basis" means, with respect to any payment to be received, that the amount of such payment is increased to the extent necessary so that, after deduction of the amount of all Taxes (assuming for this purpose that the recipient of such payment is subject to taxation at the highest U.S. federal and applicable state and local marginal tax rates applicable to widely held corporations for the year in which such income is taxable) required to be paid by the recipient less any tax savings actually realized (utilizing the same tax rate assumptions as set forth in the

735890297

immediately preceding parenthetical phrase) with respect to the receipt by the recipient of such amounts or the event giving rise to the payment, such increased payment (as so reduced) is equal to the payment otherwise required to be made.  In calculating any tax savings realized by the recipient as a result of the payment of the indemnified amount, such savings shall for purposes of making a calculation pursuant to this definition of "After-Tax Basis" be treated as actually realized if (i) payment thereof is in fact received by the Indemnitee, or (ii) if at the time of the calculation of the payment required to be made by the Sublessee to the Indemnitee, the Indemnitee shall have filed a tax return on which the item resulting in such savings shall have been reported, provided, however, in either case, if it shall subsequently be determined that the Indemnitee is not entitled to such savings, such lost savings shall be treated as a Tax for which the Sublessee is obligated to indemnify the Sublessee hereunder without regard to any exception for Excluded Taxes.

"Agreement" has the meaning set forth in the Preamble hereof.

"Agreement Supplement" means a supplement to this Agreement in the form of Exhibit B hereto.

"Aircraft" means (i) each Airframe to be delivered and used under this Agreement with the Engines initially installed on such Airframe, as described in the applicable Agreement Supplement, and (ii) all Parts used in connection with such Airframe, all as described in the applicable Agreement Supplement and (iii) all additions, attachments, accessions, replacements and substitutions therefor; and collectively, the Airframes, Engines and Parts.  Unless the context otherwise requires, the term "Aircraft" includes all Logs.

"Aircraft Marking" means, with respect to the Aircraft, the marking described in Section 17 of this Agreement.

"Airframe" means (i) each Aircraft (excluding Engines or engines from time to time installed thereon) specified by United States registration number and Manufacturer's serial number in the applicable Agreement Supplement and (ii) any and all Replacement Parts, so long as same are incorporated or installed in or attached thereto or which have been removed therefrom but where title to which remains vested in the Lessor in accordance with the terms of Section 14; and any replacement airframe which may from time to time be substituted therefor pursuant to Section 19(a).

"Alterations" has the meaning set forth in Section 14 of this Agreement.

"Authorized Officer" means (i) any of the Chairman of the Board, Vice Chairman of the Board, President, Executive Vice President, Senior Vice President, Vice President or the Treasurer of any Person and (ii) any other individual designated in writing by any officer of such Person specified in clause (i) above or duly authorized to act on behalf of such Person with respect to this Agreement.

"Base Term" means with respect to each Aircraft, the period commencing on the applicable Base Term Commencement Date and ending on the Base Term Expiry Date.

"Base Term Commencement Date" has the meaning set forth in Section 4 of this Agreement.

A-2

"Base Term Expiry Date" means with respect to each Aircraft, the fifth (5th) anniversary of the Delivery Date of such Aircraft.

"Basic Payment" means with respect to each Aircraft, 1.35% of the Lessor's Cost of such Aircraft.

"Basic Payment Date" means for each Aircraft the fifteenth (15th) calendar day of each month commencing on the Base Term Commencement Date for such Aircraft.

"Blocked Person" has the meaning set forth in Section 8(k)(ii) of this Agreement.

"Closing Date" means the date when all the conditions set forth in Section 2(a) and (b) are satisfied.

"Collateral" has the meaning set forth in Section 31(i) of this Agreement.

"Default" means any event or condition which constitutes or, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"Default Payment Amount" has the meaning set forth in Section 25(a) of this Agreement.

"Delivery Date" has the meaning set forth on the applicable Agreement Supplement.

"Dollars" and "$" each mean the lawful money of the United States of America.

"Engine" means (i) each of the Engines described and listed by applicable manufacturer's serial numbers in the applicable Agreement Supplement and originally installed on the Airframe covered by such Agreement Supplement (whether or not from time to time thereafter no longer installed on such Airframe) and (ii) any Engine which may from time to time be substituted, pursuant to Section 14 or Section 15 of this Agreement, for an Engine, including an Engine described in clause (i) above, used hereunder; together in each case with any and all Parts incorporated or installed in or attached thereto or any and all Parts removed therefrom so long as title to the Parts thereto will remain vested in the Lessor in accordance with the terms of Section 14 of this Agreement after removal from such Engine.

"Event of Default" has the meaning set forth in Section 24 of the Agreement.

"Event of Loss" means with respect to any Aircraft, Airframe or Engine, any of the following events with respect to such property: (i) loss of such item or the use thereof due to theft, disappearance for a period in excess of sixty (60) days (or such shorter period ending on the date on which an insurance settlement has been reached on the basis of a total loss), destruction, damage beyond repair or rendition of such item permanently unfit for normal use for any reason whatsoever; (ii) any damage to such item which results in an insurance settlement with respect to such item on the basis of a total loss; (iii) the condemnation, confiscation or seizure of, or requisition of title to such item by any foreign Governmental Authority for a period in excess of ninety (90) days; (iv) the condemnation, confiscation or seizure of, or requisition of title to such item by the government of the United States or any political subdivision thereof for a period in excess of one (1) year (together with the events described in clause (iii), "Requisition of Use"); or

A-3

(v) as a result of any rule, regulation, order or other action by the FAA, or other Governmental Authority having jurisdiction, the use of such item in the normal course of air transportation of persons shall have been prohibited for a period of six (6) months or more. The date of such Event of Loss will be the date of such theft, disappearance, destruction, damage, Requisition of Use or unfitness for use for the stated period. An Event of Loss with respect to any Engine will not, without loss of the Airframe to which it is attached, be deemed an Event of Loss with respect to the relevant Aircraft. An Event of Loss with respect to an Aircraft shall be deemed to have occurred if an Event of Loss occurs with respect to the related Airframe.

"Excluded Taxes" with respect to any particular Indemnitee, Taxes which are (A) imposed on, based on or measured by gross or net income (other than withholding taxes), receipts, capital and/or net worth of such Indemnitee and/or any Person holding an interests through such Indemnitee (however denominated) or doing business, minimum taxes or franchise taxes imposed on such Indemnitee or Person by the jurisdiction in which such Indemnitee or Person is organized, a taxing authority thereof or therein or by any other federal or state taxing authority of a United States jurisdiction as a result of such Indemnitee or Person doing business or maintaining an office in such jurisdiction or any other present or former connection between such Indemnitee or Person and the jurisdiction imposing such tax in each of the foregoing cases, other than any such Taxes that would not have been imposed but for (1) Sublessor having entered into, executed, delivered, performed, not performed or enforced or failed to enforce the Agreement, the other Operative Documents or any documents relating thereto or (2) Sublessor's participation in the Overall Transaction; (B) imposed on any transfer or other disposition by any Indemnitee of the Aircraft or any Part thereof or interest therein or any interest of such Indemnitee in this Agreement or any other Operative Document, other than if a Default or Event of Default shall exist at the time of such transfer or other disposition; (C) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Indemnitee to the extent of the rate at which such Tax would have been imposed pursuant to a law in effect on the Base Term Commencement Date (or, in the case of a transferee, on the date such transferee acquired its interest in this Agreement or any other Operative Document); (D) attributable to such Indemnitee's failure to deliver the United States Internal Revenue Service forms specified in Section 21(b) of this Agreement; (F) imposed under Sections 1471 through 1474 of the Internal Revenue Code or any future regulations or interpretations thereof or any agreement entered into under Section 1471(b) of the Internal Revenue Code; (G) imposed as a result of the willful misconduct or gross negligence of such Indemnitee, or (H) imposed with respect to the period after the expiration of the Sublease term set forth herein as such term may be renewed in accordance with the provisions hereof, provided that this clause (H) shall not apply with respect to fees, taxes or other charges related to events occurring or matters arising prior to or simultaneously with the expiration of the term of this Agreement or relating to payments to or for the benefit of the Indemnitee under this Agreement following the expiration of such term. Excluded Taxes shall in no event include (i) any sales and other Taxes due or payable in connection with the sale of the Aircraft, or (ii) amounts necessary for any indemnification obligation hereunder to be made on an After-Tax Basis.

"FAA Aircraft Registration Application" means the aircraft registration Form 8050-1 dated on or prior to the Delivery Date for each Aircraft by the Lessor.

"FAA Bill of Sale" means a bill of sale on AC Form 8050-2, between the applicable Seller and the Lessor in respect of an Aircraft.

A-4

"FAA Counsel" means such aviation counsel as Sublessor may designate.

"FARs" has the meaning set forth in Section 34 of this Agreement.

"First Basic Payment Date" has the meaning set forth on the applicable Agreement Supplement.

"Indemnified Taxes" has the meaning set forth in Section 21(b) of this Agreement.

"Indemnitee" means the Sublessor, its affiliates and the officers, directors, employees and authorized agents of the Sublessor, including, without limitation the "Sublessor Parent", as well as each Indemnitee as defined in the Lease and each Indemnified Party as defined in the Loan Agreement.

"Interest" has the meaning set forth in Section 5(e) of this Agreement.

"International Registry" has the meaning given to it in the Cape Town Agreements.

"Late Payment Rate" means 6.00% from the date of nonpayment until the amount due is paid in full (as well as before judgment).

"Lease" means that certain lease agreement by and between the Lessor and the Sublessor dated as of January 31, 2020, as amended or supplemented from time to time.

"Lender" means Apple Bank for Savings.

"Lessor" means Bank of Utah, not in its individual capacity but solely as Owner Trustee.

"Lessor's Cost" means the Purchase Price set forth in the applicable Agreement Supplement.

"Liability" has the meaning set forth in Section 21(a) of this Agreement.

"Lien" means, with respect to any Aircraft, (i) any lien, charge, mortgage, security interest, pledge or encumbrance of any kind in respect of such Aircraft or (ii) the interest of a vendor or lessor under any conditional purchase agreement, capital lease or other title retention agreement relating to such Aircraft.

"Loan Agreement" means that certain Loan Agreement by and between the Lessor and the Lender dated as of January 31, 2020, as amended or supplemented from time to time.

"Loaner Engine" has the meaning set forth in Section 15(b) of this Agreement.

"Logs" means, all logs, manuals and data and all inspection, modification and overhaul records (including all job cards) required to be maintained with respect to the applicable Aircraft under applicable rules and regulations of the FAA and any other governmental authority having jurisdiction, together with all records, documents, manuals, data (current and historical), and

A-5

serviceable parts, tags or overhaul records pertaining to the applicable Aircraft or any of its Engines or Parts.

"<u>Maintenance Program</u>" means (i) the MSP, or Sublessee's FAA approved maintenance program in effect on the date hereof or as modified with the approval of the FAA or (ii) any other FAA approved maintenance program for each of the Aircraft as the Sublessor may accept in writing. The Maintenance Program shall encompass scheduled maintenance, condition monitored maintenance, and on-condition maintenance of the Airframes, Engines and components of the Aircraft, including, but not limited to, servicing, testing, preventive maintenance, repairs, structural inspections, structure life improvements, system checks, overhauls, approved modifications, service bulletins, engineering orders, ADs and corrosion control inspections and treatments. All modifications and supplements to the Maintenance Program shall be provided to the Sublessor upon its request, and the Sublessor shall be given reasonable access to the Maintenance Program upon its request.

"<u>Manufacturer</u>" means HAC, with respect to the Aircraft, and with respect to the Engines, avionics or Parts, the manufacturer or supplier thereof.

"<u>Overall Transaction</u>" means all of those transactions referred to in, provided for in, or contemplated by, the Operative Documents, including, without limitation, the purchase, ownership, financing, leasing, operation, management, return, disposition, sale or other circumstance of any kind or description with respect to the Aircraft contemplated by this Agreement.

"<u>Part 135 Operator</u>" means an operator holding a certificate authorizing it to operate the Aircraft in passenger service.

"<u>Parts</u>" means all avionics, appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than complete Engines), which may from time to time be incorporated or installed in or attached to the Airframe or either Engine.

"<u>Permitted Liens</u>" means (a) the respective liens, encumbrances and/or rights of the Lessor, Sublessor, Sublessee or Lender created under or permitted by the Operative Documents; (b) the rights of others under agreements or arrangements to the extent permitted by the terms of <u>Section 22</u>; (c) Liens for Taxes of, or other government or statutory fees, charges or levies (including any thereof in respect of any airport or air navigation authority) imposed against, Sublessee, or Liens for Taxes of any Tax Indemnitee for which Sublessee is obligated to indemnify such Tax Indemnitee under any of the Operative Documents, in any such case either not yet due or being contested in good faith by appropriate proceedings so long as such proceedings do not involve any material risk of the sale, forfeiture or loss of any Airframe or Engine or the Sublessor's or the Lender's interest therein; (d) materialmen's, mechanics', workers', repairers', employees' or other like Liens arising in Sublessee's ordinary course of business for amounts the payment of which is either not yet delinquent for more than forty-five (45) days or is being contested in good faith by appropriate proceedings so long as such proceedings do not involve any material risk of the sale, forfeiture or loss of any Airframe or Engine or the Sublessor's or the Lender's interest therein; (e) Liens arising out of any judgment or award against Sublessee, so long as such judgment shall, within forty-five (45) days after the entry thereof, have been discharged (by payment, bonding or

otherwise), vacated or execution thereof stayed pending appeal or shall have been discharged, vacated or reversed within forty-five (45) days after the expiration of such stay or further stayed prior to enforcement of such Liens; (f) salvage or similar rights of insurers under policies required to be maintained by Sublessee under Section 20; and (g) any other Lien with respect to which Sublessee shall have provided a bond, cash collateral or other security in an amount and under terms reasonably satisfactory to the Sublessor or which are consented to in writing by the Sublessor.

"Primary Hangar Location" with respect to the Aircraft, has the meaning set forth in the Agreement Supplement.

"Proceeds" has the meaning set forth in Section 31(i) of this Agreement.

"Purchase Agreement" means that certain purchase agreement(s) by and between the Seller and the Sublessee, as amended or supplemented from time to time, including by any change order.

"Purchase Agreement Assignment" means that certain Assignment of the Purchase Agreement, dated on or about the date hereof, among the Seller, the Sublessee and the Lessor.

"Purchase Agreement Warranty Bill of Sale" means the bill of sale pursuant to which the Seller conveys the Aircraft to the Lessor under the Purchase Agreement.

"Replacement Parts" has the meaning set forth in Section 14 of this Agreement.

"Required Payments" has the meaning set forth in Section 5(c) of this Agreement.

"Requisition of Use" has the meaning set forth in the definition of "Event of Loss".

"Residual Value" means, for each calendar month of the Base Term for each Aircraft, the amount set forth in Annex B opposite such month.

"Residual Value Guarantor" means HAC.

"Residual Value Guaranty" or "Residual Value Guarantees" means the Residual Value Guaranty for each aircraft dated as of the Closing Date made by the Residual Value Guarantor for the benefit of Lessor.

"Security Agreement" means the Security Agreement dated as of the Closing Date between the Lessor and the Lender.

"Seller" means HAC or the Sublessee, as the case may be.

"Sublessee" has the meaning set forth in the preamble of this Agreement.

"Sublease Guarantor" means Teijiro Handa.

A-7

"Sublease Guaranty" means the Guaranty and Indemnification Agreement dated as of the Closing Date made by the Sublease Guarantor for the benefit of Sublessor and the Sublessor Parent.

"Sublessor" has the meaning set forth in the preamble of this Agreement.

"Sublessor Liens" means Liens: (i) which result from acts of, or any failure to act by, or as a result of claims against, the Sublessor, that are unrelated to the transactions contemplated by the Operative Documents or (ii) which result from acts of, or any failure to act by, Sublessor in violation of its obligations under the Operative Documents.

"Sublessor Parent" means American Honda Motor Co., Inc., a California corporation.

"Supplemental Payments" has the meaning set forth in Section 5(b) of this Agreement.

"Tax" means any and all fees (including, without limitation, documentation, license and registration fees), taxes (including, without limitation, net income, franchise, gross income, gross receipts, rents, capital, leasing, excise, fuel, excess profits, sales, use, transfer, value added, property (personal and real, tangible and intangible), lending, occupational, ad valorem, documentary, excise and stamp taxes), levies, imposts, duties, charges, assessments, or withholdings of any nature whatsoever, howsoever imposed (whether upon (i) any Indemnitee, (ii) all or any part of the Aircraft or all or any part of the payments under the Agreement or (iii) otherwise) now existing or hereafter created or adopted, imposed by any foreign, federal, state or local governmental or taxing authority, together with any and all penalties, fines, additions to tax and interest thereon.

"Termination Date" has the meaning set forth in Section 30(a) of this Agreement.

"Termination Payment" has the meaning set forth in Section 19(a) of this Agreement.

"Termination Value" means, with respect to the Aircraft, the sum of the Residual Value plus all other amounts due and payable by Sublessee to the Sublessor under this Agreement or the other Operative Documents, measured as of the date the related Termination Payment is remitted to the Sublessor.

"Transaction Expenses" means (i) the reasonable and documented fees and expenses of special counsel for the Lessor, Sublessor, Sublessee and the Lender; (ii) the reasonable out-of-pocket costs of the Lessor, the Sublessor and the Lender; (iii) recordation and filing costs of the Lessor, the Sublessor and the Lender, including all applicable FAA recordation fees and expenses; (v) the reasonable and documented fees and expenses of FAA counsel to the Lessor, the Sublessor and the Sublessee; and (vi) any sales and use taxes with respect to the transfer of title to an Aircraft to the Lessor and the subsequent leasing by the Sublessor of the Aircraft to the extent financed by the Sublessor at the request of the Sublessee.

A-8

# EXHIBIT B

## AGREEMENT SUPPLEMENT

_____, 20[●]

| | |
|---|---|
| **Purchase Price** | $_____ |
| **Basic Payment** | $[●] |
| **First Basic Payment Date** | [●] [●], 20[●] |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | [●] Honda Aircraft Company, LLC model [HA-420] [Elite] Aircraft |
| **Manufacturer's Serial Number(s)** | _____ |
| **FAA Registration Number(s)** | _____ |
| **Airframe(s)** | [●] Hours [●] Cycles (as of [●], 20[●]) [On Pro-Parts and CAMP] |
| **Engines Manufacturer & Model** | [GE Honda Aero Engines model HF120-H1A] |
| | Engine #1:          _____ |
| | Engine #2:          _____ |
| **Avionics** | [●] |
| **Parts** | [●] |
| **Interior** | [●] |
| **Exterior** | [●] |
| **Payment Account** | [●] |
| **Primary Hanger Location** | [●] |
| **Place of Delivery to the Sublessor** | [●] |
| **Place of Delivery to the Sublessee** | [●] |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)


By:
Name:
Title:

**WING SPIRIT INC.,**
(as the Sublessee)


By:
Name:
Title:

# EXHIBIT C

## RESIDUAL VALUE AMOUNTS

### [INTENTIONALLY OMITTED FOR FAA FILING]

735890297

FINAL VERSION

### AGREEMENT SUPPLEMENT

January 31, 2020

| | |
|---|---|
| **Purchase Price** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **Basic Payment** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **First Basic Payment Date** | February 15, 2020 |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | Manufacturer: Honda Aircraft Company, LLC Model: HA-420 Marketing Designation: HondaJet Elite |
| **Manufacturer's Serial Number(s)** | 42000155 |
| **FAA Registration Number(s)** | N191WS |
| **Airframe(s)** | 113 Hours 106 Cycles as of 29 January 2020 on CAMP |
| **Engines Manufacturer & Model** | Manufacturer: GE Honda Aero Engines Model HF120-H1A |
| | Engine #1:       883423* |
| | Engine #2:       883422* |
| **Avionics** | Garmin G3000 |
| **Manufacture's Specification and Description Date** | May 2018 |
| **Interior** | Four (4) passenger seats in single club configuration w/ additional side facing seat in forward cabin. Interior Color: Moonlight |
| **Exterior** | HondaJet Custom Paint Scheme Primary Color: Sunrise Tangerine Mica Stripe Color: Royal Cobalt Mica |
| **Payment Account** | [●] |
| **Primary Hanger Location** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessor** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessee** | PHNL – Honolulu, Hawaii, United States |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]

\* Each of which engines has at least 550 rated takeoff horsepower or the equivalent thereof.

Attachment No. _1_
to AIRCRAFT SUBLEASE AGREEMENT

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name: Claude Draillard
Title: Vice President

*Agreement Supplement (Sublease)*

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:   Sean I. Chu

Title:

       Senior VP and Chief Legal Officer

*Agreement Supplement (Sublease)*

FINAL VERSION

AGREEMENT SUPPLEMENT

January 31, 2020

| | |
|---|---|
| **Purchase Price** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **Basic Payment** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **First Basic Payment Date** | February 15, 2020 |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | Manufacturer: Honda Aircraft Company, LLC<br>Model: HA-420<br>Marketing Designation: HondaJet Elite |
| **Manufacturer's Serial Number(s)** | 42000156 |
| **FAA Registration Number(s)** | N192WS |
| **Airframe(s)** | 138.4 Hours 178 Cycles as of 29 January 2020 on CAMP |
| **Engines Manufacturer & Model** | Manufacturer: GE Honda Aero Engines<br>Model HF120-H1A |
| | Engine #1:        883425* |
| | Engine #2:        883424* |
| **Avionics** | Garmin G3000 |
| **Manufacture's Specification and Description Date** | May 2018 |
| **Interior** | Four (4) passenger seats in single club configuration w/ additional side facing seat in forward cabin.<br>Interior Color: Moonlight |
| **Exterior** | HondaJet Custom Paint Scheme<br>Primary Color: Sunrise Tangerine Mica<br>Stripe Color: Royal Cobalt Mica |
| **Payment Account** | [•] |
| **Primary Hanger Location** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessor** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessee** | PHNL – Honolulu, Hawaii, United States |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]

* Each of which engines has at least 550 rated takeoff horsepower or the equivalent thereof.

Attachment No. 2
to AIRCRAFT SUBLEASE AGREEMENT

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name:  Claude Draillard
Title:  Vice President

*Agreement Supplement (Sublease)*

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:   Sean I. Chu

Title:
       Senior VP and Chief Legal Officer

                         *Agreement Supplement (Sublease)*

FINAL VERSION

AGREEMENT SUPPLEMENT

January 31, 2020

| | |
|---|---|
| **Purchase Price** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **Basic Payment** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **First Basic Payment Date** | February 15, 2020 |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | Manufacturer: Honda Aircraft Company, LLC<br>Model: HA-420<br>Marketing Designation: HondaJet Elite |
| **Manufacturer's Serial Number(s)** | 42000160 |
| **FAA Registration Number(s)** | N193WS |
| **Airframe(s)** | 10.3 Hours 8 Cycles as of 29 January 2020 on CAMP |
| **Engines Manufacturer & Model** | Manufacturer: GE Honda Aero Engines<br>Model HF120-H1A |
| | Engine #1:        883433* |
| | Engine #2:        883466* |
| **Avionics** | Garmin G3000 |
| **Manufacture's Specification and Description Date** | May 2018 |
| **Interior** | Four (4) passenger seats in single club configuration w/ additional side facing seat in forward cabin.<br>Interior Color: Moonlight |
| **Exterior** | HondaJet Custom Paint Scheme<br>Primary Color: Sunrise Tangerine Mica<br>Stripe Color: Royal Cobalt Mica |
| **Payment Account** | [●] |
| **Primary Hanger Location** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessor** | KGSO – Greensboro, North Carolina, United States |
| **Place of Delivery to the Lessee** | KGSO – Greensboro, North Carolina, United States |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]


* Each of which engines has at least 550 rated takeoff horsepower or the equivalent thereof.

Attachment No. ___3___
to AIRCRAFT SUBLEASE AGREEMENT

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

    IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name:  Claude Draillard
Title:  Vice President

*Agreement Supplement (Sublease)*

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:     Sean I. Chu
Title:

          Senior VP and Chief Legal Officer

*Agreement Supplement (Sublease)*

FINAL VERSION

<u>AGREEMENT SUPPLEMENT</u>

January 31, 2020

| | |
|---|---|
| **Purchase Price** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **Basic Payment** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **First Basic Payment Date** | February 15, 2020 |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | Manufacturer: Honda Aircraft Company, LLC<br>Model: HA-420<br>Marketing Designation: HondaJet Elite |
| **Manufacturer's Serial Number(s)** | 42000161 |
| **FAA Registration Number(s)** | N551WS |
| **Airframe(s)** | 6.3 Hours 5 Cycles as of 29 January 2020 on CAMP |
| **Engines Manufacturer & Model** | Manufacturer: GE Honda Aero Engines<br>Model HF120-H1A |
| | Engine #1:      883441* |
| | Engine #2:      883434* |
| **Avionics** | Garmin G3000 |
| **Manufacture's Specification and Description Date** | May 2018 |
| **Interior** | Four (4) passenger seats in single club configuration w/ additional side facing seat in forward cabin.<br>Interior Color: Moonlight |
| **Exterior** | HondaJet Custom Paint Scheme<br>Primary Color: Sunrise Tangerine Mica<br>Stripe Color: Royal Cobalt Mica |
| **Payment Account** | [●] |
| **Primary Hanger Location** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessor** | KGSO – Greensboro, North Carolina, United States |
| **Place of Delivery to the Lessee** | KGSO – Greensboro, North Carolina, United States |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]

\* Each of which engines has at least 550 rated takeoff horsepower or the equivalent thereof.

Attachment No. ___4___
to AIRCRAFT SUBLEASE AGREEMENT

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name: Claude Draillard

Title: Vice President

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:   Sean I. Chu

Title:
        Senior VP and Chief Legal Officer

*Agreement Supplement (Sublease)*

**FINAL VERSION**

AGREEMENT SUPPLEMENT

January 31, 2020

| | |
|---|---|
| **Purchase Price** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **Basic Payment** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **First Basic Payment Date** | February 15, 2020 |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | Manufacturer: Honda Aircraft Company, LLC<br>Model: HA-420<br>Marketing Designation: HondaJet APMG |
| **Manufacturer's Serial Number(s)** | 42000073 |
| **FAA Registration Number(s)** | N992WS |
| **Airframe(s)** | 15.1 Hours 10 Cycles as of 29 January 2020 on CAMP |
| **Engines Manufacturer & Model** | Manufacturer: GE Honda Aero Engines<br>Model HF120-H1A |
| | Engine #1:        883221* |
| | Engine #2:        883222* |
| **Avionics** | Garmin G3000 |
| **Manufacture's Specification and Description Date** | January 2018 |
| **Interior** | Four (4) passenger seats in single club configuration w/ additional side facing seat in forward cabin.<br>Interior Color: Parchment |
| **Exterior** | HondaJet Signature Paint Scheme<br>Primary Color: Classic Blue<br>Stripe Color: Silver Pearl |
| **Payment Account** | [●] |
| **Primary Hanger Location** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessor** | KLNK – Lincoln, Nebraska, United States |
| **Place of Delivery to the Lessee** | KLNK – Lincoln, Nebraska, United States |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]

\* Each of which engines has at least 550 rated takeoff horsepower or the equivalent thereof.

Attachment No. _____5_____
to AIRCRAFT SUBLEASE AGREEMENT

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name:  Claude Draillard
Title:  Vice President

*Agreement Supplement (Sublease)*

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:   Sean I. Chu

Title:
        Senior VP and Chief Legal Officer

736105176                      *Agreement Supplement (Sublease)*

**FINAL VERSION**

<u>AGREEMENT SUPPLEMENT</u>

January 31, 2020

| | |
|---|---|
| **Purchase Price** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **Basic Payment** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **First Basic Payment Date** | February 15, 2020 |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | Manufacturer: Honda Aircraft Company, LLC Model: HA-420 Marketing Designation: HondaJet APMG |
| **Manufacturer's Serial Number(s)** | 42000111 |
| **FAA Registration Number(s)** | N994WS |
| **Airframe(s)** | 12.8 Hours11 Cycles as of 29 January 2020 on CAMP |
| **Engines Manufacturer & Model** | Manufacturer: GE Honda Aero Engines Model HF120-H1A |
| | Engine #1:          883335* |
| | Engine #2:          883334* |
| **Avionics** | Garmin G3000 |
| **Manufacture's Specification and Description Date** | January 2018 |
| **Interior** | Four (4) passenger seats in single club configuration w/ additional side facing seat in forward cabin. Interior Color: Parchment |
| **Exterior** | HondaJet Signature Paint Scheme Primary Color: Silver Pearl Stripe Color: Gray Gradient |
| **Payment Account** | [●] |
| **Primary Hanger Location** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessor** | KLNK – Lincoln, Nebraska, United States |
| **Place of Delivery to the Lessee** | KLNK – Lincoln, Nebraska, United States |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]

\* Each of which engines has at least 550 rated takeoff horsepower or the equivalent thereof.

Attachment No. _____6_____
to AIRCRAFT SUBLEASE AGREEMENT

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name:  Claude Draillard
Title:  Vice President

*Agreement Supplement (Sublease)*

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:    Sean I. Chu
Title:
         Senior VP and Chief Legal Officer

736105176                    *Agreement Supplement (Sublease)*

**FINAL VERSION**

AGREEMENT SUPPLEMENT

January 31, 2020

| | |
|---|---|
| **Purchase Price** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **Basic Payment** | [INTENTIONALLY OMITTED FOR FAA FILING] |
| **First Basic Payment Date** | February 15, 2020 |
| **Delivery Date** | The date above first written |
| **Aircraft Manufacturer & Model** | Manufacturer: Honda Aircraft Company, LLC<br>Model: HA-420<br>Marketing Designation: HondaJet APMG |
| **Manufacturer's Serial Number(s)** | 42000118 |
| **FAA Registration Number(s)** | N996WS |
| **Airframe(s)** | 6.7 Hours 5 Cycles as of 29 January 2020 on CAMP |
| **Engines Manufacturer & Model** | Manufacturer: GE Honda Aero Engines<br>Model HF120-H1A |
| | Engine #1:        883351* |
| | Engine #2:        883352* |
| **Avionics** | Garmin G3000 |
| **Manufacture's Specification and Description Date** | January 2018 |
| **Interior** | Four (4) passenger seats in single club configuration w/ additional side facing seat in forward cabin.<br>Interior Color: Moonlight |
| **Exterior** | HondaJet Corporate Paint Scheme<br>Primary Color: Classic Blue Pearl<br>Stripe Color: Silver Pearl |
| **Payment Account** | [●] |
| **Primary Hanger Location** | PHNL – Honolulu, Hawaii, United States |
| **Place of Delivery to the Lessor** | KGSO – Greensboro, North Carolina, United States |
| **Place of Delivery to the Lessee** | KGSO – Greensboro, North Carolina, United States |

All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

[Signature Pages Follow]

* Each of which engines has at least 550 rated takeoff horsepower or the equivalent thereof.

Attachment No. ____7____
to AIRCRAFT SUBLEASE AGREEMENT

DocuSign Envelope ID: DA796588-6E2E-426D-9E67-55387D646451

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement Supplement as of the date above first written.

**HONDA AIRCRAFT COMPANY, LLC,**
(as the Sublessor)

By: _____

Name:  Claude Draillard
Title:  Vice President

DocuSign Envelope ID: 99EF7986-81A3-41A0-9628-E5AB736E1E07

**WING SPIRIT INC.,**
(as the Sublessee)

By: _____

Name:    Sean I. Chu

Title:

        Senior VP and Chief Legal Officer

*Agreement Supplement (Sublease)*